UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

FOSTER THOMPSON,

Petitioner,

– against –

SUPERINTENDENT, Sing Sing Correctional Facility,

Defendant.

**MEMORANDUM & ORDER**

20-CV-5805 (ERK) (VMS)

KORMAN, *J.*:

## OVERVIEW

In 1994, a Staten Island jury convicted Foster "Poppy" Thompson of murder, attempted murder, and a weapons offense related to a shooting that took place two years prior. The conviction came after two mistrials—including one where the jury hung ten to two in favor of acquittal—and despite weak inculpatory evidence.

Thompson filed this petition for a writ of habeas corpus challenging his conviction, but nearly all of his claims are untimely because he filed his petition more than one year after the facts underlying those claims were known or could with due diligence have been discovered. *See Rivas v. Fischer*, 687 F.3d 514, 534 (2d Cir. 2012). Although he offers new evidence to cast doubt on his guilt, that evidence cannot satisfy the "deliberately demanding" standard to overcome untimeliness by

establishing that, in light of new, credible evidence, more likely than not any reasonable juror would have reasonable doubt. *See Hyman v. Brown*, 927 F.3d 639, 656–57 (2d Cir. 2019) (internal quotation marks omitted). And although he advances one timely claim, that claim is not cognizable on habeas review.

## BACKGROUND

Thompson asserts that his showing of actual innocence excuses any untimeliness in his habeas petition. *See* ECF No. 1 at 14. Assessing such a claim requires a federal habeas court to "consider 'all [record] evidence,' old and new . . . ." *House v. Bell*, 547 U.S. 518, 538 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 328 (1995)). My review of the factual record is therefore necessarily lengthy, requiring "meticulous assessment" of the evidentiary materials in Thompson's original trial as well as the state court post-trial record. *See Jimenez v. Stanford*, 96 F.4th 164, 171 (2d Cir. 2024).

### I. Shooting and Investigation

Just before 2:00 AM on the rainy morning of July 4, 1992, there was a knock on the door of Apartment 3F at 151 Jersey Street in Staten Island. State Court Record ("SCR") at 315–317, 392–93, 1895.[1] The apartment was occupied at the time by the

[1] The vast majority of the State Court Record is available at ECF No. 19-1 through ECF No. 19-12; citations to "SCR" refer to pages within those attachments. An index identifying the State Court Record documents and corresponding page numbers is available at ECF No. 19.

tenant, Clara Reynolds, who was bedridden; Alton Staley, who sold drugs out of the apartment; and Cynthia Browning, Staley's associate who also took care of Reynolds. *Id.* at 316–18, 375–76. When someone inside the apartment unlocked the door in response to the knocking, two men forced their way in and a melee ensued. *Id.* at 1895. Browning was shot and killed, Staley was shot and critically injured, and the assailants fled. *Id.*

Responding police officers pursued two men, one wearing a red sweatshirt and another wearing a blue denim jacket, through the streets behind the apartment building. *Id.* at 1035–39. The police were not, however, able to detain or arrest anyone the night of the shooting. *Id.* at 982–83. During the chase, one fleeing suspect discarded the red sweatshirt and a white t-shirt and the other discarded the denim jacket. *Id.* at 990–92; 1037–38. While the police recovered these discarded items of clothing—along with three weapons—the police and prosecutors have stated that the red sweatshirt was lost that night. *Id.* at 989–91, 998, 1066–67.

Staley was arrested at the scene of the shooting on suspicion of the attempted murder of Browning, who was not yet confirmed dead; assault in the first degree; and criminal possession of a controlled substance in the third degree for the ninety-five vials of crack cocaine found in his pocket. *See id.* at 2401. After being transported to the hospital and undergoing surgery, Staley spoke to an NYPD detective and identified "Poppy Thomas" as the person who shot him. *Id.* at 447–

48; *see also id.* at 1410–11. Police officers identified Foster Thompson as a suspect. *See id.* at 1485.

Within hours of the shooting, officers also interviewed a woman named Denise Concepcion, a witness who was outside Apartment 3F immediately before the shooting. She told them that she could not identify the men she saw in the hallway because she could not see their faces. *Id.* at 750–51, 803. Almost three months later, on September 29, 1992, Concepcion submitted to a second interview at the Richmond County District Attorney's Office. ECF No. 31-1 at 33–34. Hanging in the interview room was a "wanted" poster with two pictures of Thompson and the caption "wanted for murder of Cynthia Browning." *Id.* at 40–42. During this interview, Concepcion now stated that she *did* get a good look at the men, and she identified Thompson as the person wearing the red hooded sweatshirt whom she had seen in the hallway outside Apartment 3F. *Id.* at 38–39.

On November 12, 1992, Thompson was placed under arrest for his suspected role in the shooting. *Id.* at 1419. A grand jury indicted and charged him with second-degree murder, attempted second-degree murder, criminal possession of a weapon in the second degree as to three firearms, and criminal possession of weapon in the third degree as to one firearm. *Id.* at 1893, 1950–51.

Thompson and Browning were part of the same extended family; Thompson's sister Charlene and Browning's brother Kenneth shared two children. *Id.* at 5383,

5391, 5421; *see also id.* at 1641. Though Thompson said that he and Browning had been friends, *see id.* at 1883, the extent of his and Browning's relationship prior to her death is not otherwise apparent from the record.

## II. Thompson's Trials

Thompson was tried three times. His first trial, conducted jointly with co-defendant Gilbert Franklin, the alleged second shooter, ended in a mistrial in March 1994 following improper contact between petitioner's mother, Brenda Thompson, and a juror in a courthouse bathroom. *Id.* at 123–25, 2583. Thompson was again tried jointly with Franklin in June 1994, also resulting in a mistrial; ten jurors voted to acquit and two voted to convict. *Id.* at 2272, 2382, 5568.

At Thompson's final trial, Thompson was the sole defendant. *See id.* at 2698. The prosecution's case rested mainly on the testimony of Staley and Concepcion. Staley testified that, shortly before 2:00 AM on July 4, 1992, he was in Apartment 3F with Browning when someone knocked on the door and, in a disguised voice, asked, "Is Cynthia there?" *Id.* at 392–94. Staley said Browning replied that she was not there. *Id.* at 394. About fifteen minutes later, according to Staley, Browning opened a window and called down to Concepcion on the street below, asking her to bring up a cigarette. *Id.* at 412. Five minutes after that, someone again knocked on the door, and Staley heard Concepcion (whom he knew) identify herself as "Neecee" and ask Browning to open the door. *Id.* at 412–13. Staley testified that Browning

opened the door, at which point two men forced their way into the apartment while shooting. *Id.* at 395, 414. Staley said he returned fire with his own unlicensed gun—a .25-caliber pistol—until it jammed. *Id.* at 387–88, 395, 506–08. As he attempted to run, he was shot in the buttocks. *Id.* at 395. Then, he said, one of the assailants took Staley's gun from his hand and shot him in the neck. *Id.* at 396, 437–39. He heard Browning plead with the men not to kill her and to take drugs from Staley's pocket instead, and someone pulled drugs out of Staley's pocket but put them back. *Id.* Staley said that the men dragged Browning to the living room and he heard two or three shots and then the front door slam shut. *Id.* at 441–42.

Staley stated that he immediately recognized Thompson as the man who shot him in the neck when the man ran into the well-lit kitchen in the apartment. *Id.* at 395, 506. According to Staley, he knew Thompson from middle school and from the neighborhood. *Id.* at 398–400. Nevertheless, Staley conceded that he did not relay this identification to the police at the crime scene due to the extent of his injuries. *Id.* at 442.

Staley received immunity from prosecution for his drug and weapon charges because they related to his subpoenaed testimony before the grand jury in Thompson's case. *See id.* at 188; *see also* N.Y. Crim. Proc. Law § 190.40. Whether this immunity could properly be characterized as consideration (or a benefit or a deal) from the District Attorney's Office was sharply contested at various points in

the trial. During jury selection, a potential juror asked whether the District Attorney had made "deals" with anyone who would be called as a witness, including any "drug dealers." *See* SCR at 180. Assistant District Attorney Mark Macron ("ADA Macron" or "Macron") responded that "[t]here were no deals made" with any of the witnesses, eliciting an objection from defense counsel that the trial judge dismissed. *See id.* Then, during opening statements, defense counsel argued that Staley received a "break[]" in exchange for his grand jury testimony. *See id.* at 346–48. The trial court instructed the jury that Staley receiving transactional immunity from any prosecution related to the events of July 4, 1992, was "automatic[], not by anything the District Attorney arranged." *Id.* at 348.

Later, on direct examination by the prosecutor, Staley testified that he was charged with drug and weapon offenses and further stated he had not received any consideration from the District Attorney. *Id.* at 446. Defense counsel objected and asked the trial court for a curative statement, but the court overruled the objection and added, "You can cross-examine the witness." *Id.* at 447. Staley then continued to testify on direct that he had not, to his knowledge, received any benefit from the District Attorney and that he did not know what happened to the case against him. *Id.* When defense counsel sought to ask Staley on cross-examination whether he was aware that he would receive immunity when he testified before the grand jury,

the trial court instructed the jury that "[t]here's automatic immunity" as a matter of law and did not allow the question. *Id.* at 479–80.

The trial judge's jury instructions and evidentiary rulings, as well as the prosecutor's statements, relating to Staley's immunity are problematic. First, it is true that, under New York law, a subpoenaed grand jury witness automatically receives transactional immunity. *See* N.Y. Crim. Proc. Law § 190.40; *see also United States v. Interborough Delicatessen Dealers Ass'n*, 235 F. Supp. 230, 231 (S.D.N.Y. 1964). But no competent prosecutor would subpoena a grand jury witness suspected of criminal activity, thus opening the door to transactional immunity, without obtaining from the potential witness an understanding that his testimony would be helpful to the prosecution. It was thus misleading to suggest that there was no bargain, whether explicit or implicit, between Macron and Staley for Staley's grand jury testimony. Second, and more importantly, the limits placed on defense counsel's cross-examination of Staley at least arguably implicated Thompson's rights under the Confrontation Clause of the Sixth Amendment. Nevertheless, Thompson did not raise these issues in his habeas petition, nor did he do so on direct appeal or in collateral state proceedings. While I flag them here, they cannot provide a basis for habeas relief.

Concepcion was compelled to testify under a material witness order signed by the trial court. *Id.* at 2376–78. At 1:45 AM on July 4, 1992, she was standing outside

of 151 Jersey Street with Dawne "Nikki" Wolfe. *Id.* at 701–02; *see also id.* at 1219. She corroborated Staley's account that Browning called to her from Apartment 3F's window requesting cigarettes. *Id.* at 707. She said that she entered the building and went to the third floor to bring one to Browning. *Id.* Once Concepcion was upstairs, two men came running out of the staircase with guns and rushed into Apartment 3F when the door was unlocked for her. *Id.* at 707–11, 745. She described one man as wearing a red hooded sweatshirt and identified him as petitioner, *id.* at 712–13, 737–38, and she described the other man as wearing a dungaree jacket, *id.* at 714, 720–21. Concepcion ran to the second floor and then out of the building, and she continued running to a nearby shop and then towards a bar. *Id.* at 710–11, 747–48. She said Browning's brother Larry Browning and his friend James Dale encountered her near the bar, threatened her, and brought her to the police to share what she had seen. *Id.* at 749, 800. Concepcion explained that, because she was scared, she initially told the police she did not know anything. *Id.* at 750–51, 801, 803–04.

Concepcion conceded that she could not see the entire face of the man wearing the red hooded sweatshirt and could see only his eyes. *Id.* at 737, 845–46. She also stated that the man she saw in the red hooded sweatshirt had a "rat face," and she seemed to become flustered when confronted with her testimony from a prior trial where she stated that petitioner did *not* have a "rat face." *Id.* at 856–58. In addition, she said she identified Thompson in a lineup conducted in October 1992 but later

acknowledged that he was instead in one conducted in the summer of 1993. *Id.* at 764–67. Finally, Concepcion admitted that she previously used crack cocaine—sometimes buying it from Browning—but claimed that she had discontinued use just weeks before the shooting. *Id.* at 690, 697, 767. Defense counsel questioned whether Concepcion had in fact discontinued drug use at the time by eliciting testimony that she had used drugs while pregnant. *Id.* at 769.

Nikki Wolfe also testified for the prosecution. *Id.* at 1219. She stated she was with Concepcion outside 151 Jersey Street when Browning yelled down to Concepcion requesting a cigarette. *Id.* at 1221–22. Wolfe said that she entered the building with Concepcion but remained near the front door of the lobby, exiting the building when she heard gunshots. *Id.* at 1226–28. She ran to the building next door, 131 Jersey Street, and stood outside. *Id.* at 1222. A "little while" later, Wolfe testified, she went to a phone booth to call a cab and then returned to 131 Jersey Street. *Id.* at 1222, 1233. "[A] little while after that"—but still before she saw the police arrive on the scene—Wolfe saw Thompson run around from the back of 131 Jersey Street with an open umbrella and then saw him standing with the group of people in front of that building. *Id.* at 1222, 1234–35, 1250. She said he was wearing a navy sweatshirt without a hood. *Id.* at 1234.

Police officers involved in the crime scene pursuit testified that they chased two men, one in a red sweatshirt and one in a blue denim jacket, through the streets

behind 151 Jersey Street but could not apprehend them. SCR at 979–82, 1035–43, 1060–64. Although they testified that the men discarded a red sweatshirt, a white t-shirt, and a denim jacket as they fled, the officers said they did not know what became of the red sweatshirt. *Id.* at 984, 990–91, 1037-41, 1070. The responding officers described recovering a .38-caliber revolver, a 9-millimeter semiautomatic pistol, and a .25-caliber semiautomatic pistol. *Id.* at 986–87, 1066–68. The .38-caliber revolver and .25-caliber pistol were found in the pocket of the denim jacket that the police recovered. *Id.* at 986–87. The 9-millimeter pistol was located on the ground by an officer retracing the path of the individual in the red sweatshirt after he had gotten away. *Id.* at 1066–68.

A police officer from the ballistics squad testified that microscopic analysis matched all three weapons to ballistics evidence recovered at the crime scene. *Id.* at 1110–20. The medical examiner who conducted Browning's autopsy testified, however, that he could not confirm which caliber bullet or bullets produced Browning's specific wounds because the size of an entrance wound does not necessarily correlate to the size of the bullet. *Id.* at 1167.

No physical evidence directly tied Thompson to the murder. Two acquaintances of Thompson, Samuel Richardson and James Dale, provided alibi testimony, but it nonetheless placed Thompson near the scene of the crime as the crime was occurring. Richardson testified that Thompson was with him passing by

151 Jersey Street on the way to get a drink when they heard the gunshots coming from inside. *Id.* at 1290–94. Richardson said they turned around and went to the front of the building next door, where they were standing when the police arrived. *Id.* at 1293, 1296. Dale testified that he arrived at the building next door soon after the shooting took place, saw Thompson standing outside with Richardson and another person, and learned from Thompson that Browning had been killed. *Id.* at 1340–41, 1377. Dale then drove to find Larry Browning—his friend and Cynthia's brother—to tell him the news. *Id.* at 1346. After bringing Larry Browning to Apartment 3F, Dale said he heard Concepcion may have had information about the shooting, so the two men went looking for her. *Id.* at 1352–53. His testimony was consistent with Concepcion's testimony that Dale and Larry Browning confronted her outside a nearby bar and took her to the police. *Id.* at 1353–55.

The jury convicted Thompson of second-degree murder for Browning's death, second-degree attempted murder regarding Staley, and possession of an illegal handgun for the 9-millimeter pistol, but they acquitted him of weapons charges related to the other two guns. *Id.* at 1798–1801. On their verdict sheet, the jury added markings with the caliber of the weapon next to each weapons charge. *Id.* at 1803; *see also id.* at 1950–51.

A few days after the jury verdict, an anonymous person who claimed to be a juror in Thompson's case wrote to the trial judge claiming that the verdict was not

based on the evidence but instead reflected the "senior members of [the] jury . . . vent[ing] their anger" against the Black community following the acquittal of another Black man for an unrelated murder of an elderly white woman. *Id.* at 1949. The trial judge denied Thompson's request to interview the jurors about potential bias and sentenced him to an aggregate prison term of thirty-seven and a half years to life. *Id.* at 1827–29, 1886–88.

## III. Post-Conviction Direct Appeal

On direct appeal, Thompson argued that: (1) he had been denied his right to be present at a hearing on co-defendant Franklin's suppression motion; (2) the jury's annotated verdict sheet was unlawful; (3) the trial court's reasonable doubt instruction improperly shifted the burden of proof to the defense; (4) there was insufficient evidence to support his conviction; and (5) the trial court abused its discretion in denying him a hearing on alleged juror misconduct. SCR at 1890–91.

The Appellate Division affirmed Thompson's conviction on December 1, 1997. *People v. Thompson*, 670 N.Y.S.2d 115, 115–16 (N.Y. App. Div. 1997). It held that the trial court did not abuse its discretion in denying Thompson a hearing on the alleged juror misconduct because the claim was based on an anonymous letter rather than a sworn allegation. *Id.* at 116. In addition, it held that there was sufficient evidence to support Thompson's conviction. *Id.* Lastly, the Appellate Division held that Thompson's "remaining [three] contentions [we]re either unpreserved for

appellate review or without merit." *Id.* Thompson sought leave to appeal his conviction to the Court of Appeals, SCR at 1992–99, which was denied on April 8, 1998, *People v. Thompson*, 695 N.E.2d 727 (N.Y. 1998).

## IV. Defense Investigation

An investigative team comprising three lawyers and former NYPD homicide detective Edward Dowd undertook a pro bono effort to further investigate Thompson's conviction and the 1992 shooting. ECF No. 9 at 1, 13. The multi-year investigation, which began in 2009, yielded the following:

### A. Brenda Thompson's Affidavit

Foster Thompson's mother, Brenda Thompson, provided an affidavit in 2015 implicating a man named David Clark, whom she said was "sometimes referred to as Jamaican Tony," in Cynthia Browning's murder. SCR at 2323–24. Specifically, she said that in 1992, she was living in an apartment in the Bronx. *Id.* at 2323. She stated that at the time Clark was in a relationship with her now-deceased daughter, Lynette, and they were renting a room in the apartment. *Id.* Brenda's granddaughter (Thompson's niece), Candice Thompson, also lived there. *Id.*

Brenda attested that on the night of the shooting, she was at her apartment and woken up in the middle of the night by Clark. *Id.* Clark told her that "he paid a girl with crack to knock on the door of a crack spot in Staten Island" to help him and

Candice's boyfriend, Kwan,[2] gain access to the apartment. *Id.* Clark said a man inside the apartment started shooting, and that man shot Browning in the crossfire. *Id.* at 2323–24. He said that Kwan shot the man and that Clark also shot Browning in the face because she clung to Clark's leg as he tried to flee. *Id.* Brenda attested that Kwan at some point separately admitted that he was involved in the shooting, *id.* at 2324, though she did not indicate to whom or how she learned about the purported admission.

Brenda stated that after petitioner's arrest she told police officers in the Bronx that Clark and Kwan—not Thompson—were responsible for Browning's murder, and she was told the information would be relayed to the police in Staten Island. *Id.* at 2324. In addition, she averred that, months after the murder, federal agents told her that unless she could convince Thompson to admit to two unrelated bank robberies that they were investigating, "they would railroad him for the Cynthia Browning murder." *Id.*

Brenda further attested that while she notified petitioner's trial counsel about Clark and Kwan's admissions, counsel told her that nobody would believe her because she was Thompson's mother. *Id.* at 2324–25. She said she also advised

---

[2] Documents in the record alternate in referring to him as Kwan or Quan. For the sake of consistency, I use Kwan throughout this opinion.

petitioner's trial counsel to speak to Candice but was told that "because Candice was a minor, she would not be used as a witness." *Id.* at 2325.

Brenda's affidavit contradicted the prosecution's case by suggesting that Clark and Kwan—not Thompson and Franklin—were the two men who forced their way into Apartment 3F, and that Browning was shot by Staley and Clark.

**B. Candice Thompson's Statement**

On May 25, 2016, Candice, accompanied by a lawyer, waived immunity and provided a videotaped statement[3] to the District Attorney's Office, during which she described the shooting as the product of an attempted robbery orchestrated by Clark. SCR at 2326–27.

In July 1992, Candice was fifteen years old and living in the Bronx with her grandmother Brenda Thompson and several cousins. She said her aunt, Lynette, was also staying with them after losing her apartment, and David Clark, the father of two of Lynette's children, would come and go. Candice said Clark's street names were "Jamaican Tony" and "Japanese Tony."

Candice was dating an older boy named Kwan who lived downstairs; they had been together for maybe two months and Candice never knew his last name. On the

[3] A transcript of the video does not appear to have been provided by either of the parties.

afternoon of July 2, 1992,[4] she was with Kwan outside of her grandmother's building when Clark approached Kwan and asked to talk. Candice walked away. She had never seen Clark and Kwan interact before. She knew Clark used to have boys sell drugs for him, but she could not hear Clark and Kwan's discussion, and Kwan would not tell her what they talked about once she returned.

Later that night, Kwan came to Brenda's apartment and Candice snuck into the hallway to talk to him. Kwan told her Clark wanted Kwan to go for a "ride" with Clark to Staten Island. Candice questioned why he would involve himself with Clark, who was "nothing but trouble," but she ultimately decided to join them. Candice and Kwan left the apartment building; it was before 5:00 AM.

Candice, Kwan, and Clark took the subway downtown together. By the time they arrived at the ferry to Staten Island, it was early in the morning and the sun was up, but Candice did not recall the time.

The group arrived in Staten Island and took a bus to the bottom of Jersey Street. As they walked, Clark took a bookbag from Kwan that Kwan had been carrying and for the first time, Candice said, she overheard Clark talking to Kwan about plans for a robbery. A man approached Clark and tried to persuade him to

---

[4] The Assistant District Attorney asked Candice to walk through her day on July 3, 1992, leading up to the shooting in the early hours of July 4, 1992. Although Candice purports, here, to start describing her movements on July 3, she later indicates she spent a full day on Staten Island immediately before the shooting. I therefore presume her account begins on July 2, 1992.

leave, saying that the person Clark intended to rob was not there. Candice recalled that Clark got angry and did not believe him. Kwan then tried to tell Clark that he and Candice were leaving, and Clark pushed back, saying Clark needed the money. Candice was not sure what time this conversation occurred but said it had gotten dark really fast and estimated it was maybe 7:00 or 7:30 PM. Candice said she then tried to convince Kwan to leave anyway, but Kwan said he could not leave because his cousin's gun was in the bookbag that Clark now held.

Kwan and Candice followed Clark up the hill, and they came upon Cynthia Browning. Candice knew Browning because Browning's brother and Candice's aunt had two children together. Candice heard Clark tell Browning that he would give her some crack cocaine if she did him a favor—knocking on a door for him. Browning agreed and walked to 151 Jersey Street with the group.

They arrived at the building and, despite her reservations, Candice entered. Asked by the Assistant District Attorney how they got up to the third floor, she replied, "Oh, it's the third floor? An elevator." Candice said she stayed by the elevator while Browning, then Clark, and then Kwan approached an apartment down the hallway. She saw Browning knock on the door, the door open, and Clark shove Browning into the door. She heard a "commotion," including maybe two "pows," and ran down the back staircase.

While running from the building, Candice said she heard Kwan screaming her name and met him on top of a nearby abandoned building. She said it had started pouring rain and they heard sirens. Kwan told Candice that "David shot her," which Candice understood to mean Clark shot Browning.

After some time, Candice and Kwan left the abandoned building and walked towards the ferry. On their way, Candice said Kwan removed a white t-shirt he was wearing, wrapped it around the gun he was holding, and discarded the gun in a garbage can.

Candice and Kwan travelled back to her grandmother's apartment, arriving once it was already daylight. Candice said she broke down crying and told her grandmother "everything," including that Kwan said Clark shot Browning. Within an hour, Clark arrived at the apartment and started threatening Kwan, and Kwan forced his way out. After more arguing with Lynette, Clark left too. During that time, Candice also told a cousin what happened.

Candice stated that she next saw Clark about two or three weeks later at her grandmother's apartment, when he came to ask Lynette for money and seemed to threaten Candice not to talk about the shooting. Clark and Lynette had an altercation outside, leading Candice to call the police on him and get him "locked up." Candice said she informed the police that Clark should be wanted for murder in Staten Island, but she was told the police in Staten Island had the person they wanted.

When her uncle was arrested for Browning's murder, Candice did not go to the police again because, she said, she was letting her grandmother handle it. Nevertheless, she recalled telling people at the time—including at the courthouse—that Thompson was not responsible for the shooting. She said nobody would listen to her and only her grandmother and Lynette believed her. At some point, she also relayed what happened to her father, who cautioned her not to talk about it because Clark was dangerous. Candice said she first told Foster Thompson sometime between 2012 and 2016.

Candice stated that in the weeks after the shooting, Kwan told her grandmother that he was willing to testify against Clark. Candice said she did not herself see Kwan again until "maybe months" after the shooting, sometime after Thompson's arrest. The following day, Kwan was killed in an unrelated incident.

Candice's version of events offered Clark and Kwan as the perpetrators rather than Thompson and Franklin, and it placed Browning outside the apartment knocking on the door rather than Concepcion. Her claim that the group took the elevator upstairs also contradicted Concepcion's testimony that two men rushed out of the stairwell. In addition, Candice's account that Kwan stashed his gun in a garbage can was at odds with police testimony that they recovered the guns that they tied to the shooting in the pocket of the denim jacket discarded by one fleeing suspect, and along the path taken by the other fleeing suspect in the red sweatshirt.

**C. Davina Thompson's Interview**[5]

Dowd also learned that Clark purportedly admitted his involvement in the murder to his and Lynette's daughter, Davina Thompson. In 2015, Davina, accompanied by counsel for petitioner, went to the District Attorney's Office for an interview, during which she said Clark admitted to her that he had shot Browning in the jaw 'to relax her' just before he fled the apartment. SCR at 2278.

**D. Statements from David Clark, a.k.a. "Jamaican Tony"**

Thompson's investigative team tracked Clark to Jamaica in 2016. *Id.* at 2263. In February 2017, Dowd traveled there and obtained a nine-minute video statement and three-page written statement from Clark. *See id.* at 5330–31, 5587–88. Dowd convinced Clark to provide these statements after showing Clark the video of Candice's interview with the District Attorney's Office.[6] *Id.* at 5337–39.

In his video statement,[7] Clark relayed a similar account to the one Candice shared with the District Attorney's Office. *Id.* at 2320–21. He said that on the night of July 3, 1992, he, Kwan, and Candice conspired to commit a robbery at an apartment in a housing project on Jersey Street in Staten Island. He did not recall

[5] Although an order from the § 440.10 motion court makes repeated reference to an affidavit obtained from Davina Thompson, SCR at 5570, 5593 n. 9, 5604, no such affidavit appears in petitioner's submission to that court, *see id.* at 2274–75 (listing attached exhibits), or in the record submitted to this Court.

[6] The full circumstances surrounding Clark's statements are discussed *infra*.

[7] A transcript of the video does not appear to have been provided by either of the parties.

the street address or specific apartment but said he thought the apartment was on the third floor. The group took a ferry followed by a bus and then walked the rest of the way along a less well-lit "back street." Clark said that when the group arrived at the building, they went upstairs, where they met Browning.

Clark explained that he knew Browning because he had sold her crack cocaine on multiple occasions. He and Kwan asked Browning, who knew the people inside, to knock on the door to help them gain entrance to the apartment, and she agreed. Clark said Kwan took a revolver out of his backpack and handed it to Clark, and that Kwan had a firearm in his hand as well. Later on in the video statement, Clark reiterated that Kwan supplied the guns and Clark did not own one.

After Browning knocked on the apartment door, Kwan and Clark pushed their way in, with Kwan in front. Once inside the apartment, Clark heard "explosions" like a gunshot and dropped to the ground. He said it was dark in the apartment and he crawled into what he assumed was the kitchen because he stumbled upon the refrigerator. While he was hiding in the kitchen, he heard more gunshots and someone speaking, but he did not hear what was said. He tried to return fire but said the gun was not working.

After another couple of minutes, Clark said he heard another "explosion" and then saw the door to the apartment was wide open. Clark ran downstairs and heard Kwan coming behind him. It was still raining and Clark did not want to get wet, and

he heard police sirens approaching. He decided to go to a nearby private building, and he hid the revolver there.[8] Some time later, Clark walked to the ferry and returned to the Bronx. He said he went home—to a building on Morris Avenue where "Ms. Thompson" and her daughter and grandchildren lived—went straight to bed, and did not meet up with anyone. Clark did not know where Kwan went after he fled the building on Jersey Street and did not see him that night. Clark did not know where Candice was while the shooting unfolded and suggested she may have gone downstairs, and he also did not see her again that night.

Clark confirmed in the video statement that he was known by the name "Jamaican Tony," but he did not remember how he got that nickname.

Shortly after providing the video statement, Clark reviewed and signed a sixteen-point written statement that was prepared and notarized by a member of Thompson's legal team. SCR at 2224, 5343–44, 5354–55. The written statement contained a few new details compared to the video statement, including that Clark knew drugs were sold at the apartment targeted for the robbery, that a male opened the door in response to Browning's knocking, and that Clark hid his gun in a hat and stashed it in the bushes. *Id.* at 5587. It also differed from the video statement, because it described Clark entering the apartment ahead of Kwan, rather than the reverse. *Id.* at 5594.

---

[8] Clark did not indicate with any specificity where exactly he hid the revolver.

Like Candice's interview, Clark's account contradicted the prosecution's theory of the case—namely, that the shooting was perpetrated by Thompson and Gilbert Franklin, with unwitting assistance by Concepcion, who knocked on the apartment door. It also placed Browning outside the apartment before the shooting and suggested Staley was the one who unlocked the door instead. And, because Clark described fleeing undetected, it contradicted the prosecution's theory that the police gave chase to the two people involved in the shooting.

**E. Jackie Holman DD5**

In 2016, the District Attorney produced "DD5 #2" (or the "Holman DD5") to Thompson's investigative team for the first time pursuant to their request under New York's Freedom of Information Law ("FOIL"), N.Y. Pub. Off. L. § 84 *et seq.*; SCR at 2268. DD5 #2 memorialized an interview conducted by NYPD Detective Victor Ruiz of a woman named Jackie Holman in the hours after the shooting. SCR at 2333.

Detective Ruiz noted that Holman, who died before Thompson's first trial,[9] said that she was walking in front of 151 Jersey Street that night when Browning called out to her and asked her to "check out some guys hang[ing] out in the hallway." *Id.* Holman went to the third floor of the building and observed a Black man exiting the staircase, which she reported back to Browning. *Id.* Holman

[9] Holman died on or about March 17, 1993. *See* ECF No. 34 at 1.

described him to Detective Ruiz as follows: 27 years old; 5 feet, 8 inches in height; 170 pounds; brown eyes; short, black hair; and wearing a "[b]lum [sic] jean shirt," a t-shirt, "[b]aggy blue jean[s]," and a "DArk jamiaan [sic] hat." *Id.*

Holman said Browning asked her to check another stairway, which she did on her way downstairs at about 12:45 AM, observing a second Black man she identified to Detective Ruiz as "Tony." *Id.* When Holman exited the building, she called up to Browning to tell her what she saw. *Id.* Holman described "Tony" to Detective Ruiz as follows: 30 years old; 5 feet, 7 inches in height; 120 pounds; brown eyes; short, black hair and a mustache; and wearing a "[d]ark red sweat shirt" and dark pants. *Id.* She told Detective Ruiz that "Tony" sold crack and had a blue Maxima and that she had known him for "about one year." *Id.*

Twenty minutes later, at 1:05 AM, Holman[10] saw the first man and "Tony" again—together this time, along with a third man who was wearing a "light blue jean jacket"—near the rear exit of the building. *Id.* She returned home and later learned of Browning's death. *Id.*

Holman's reported observations occurred about an hour before the shooting. Her descriptions of what the first man and "Tony" were wearing were consistent

---

[10] Here and in two other instances in Detective Ruiz's summary of the interview, the DD5 purports to describe statements by the "Victim" (i.e., Browning). SCR at 2333. Based on the context, however, I presume he intended to write "Witness."

with clothing descriptions of the two suspects provided by other witnesses. *See id.* at 732–33 (Concepcion), 967 (responding police officer), 1038 (second responding officer). However, Holman identified the man in the red sweatshirt that she saw as "Tony," while the prosecution's theory of the case identified Foster Thompson as the shooting suspect in the red sweatshirt.

**F. Missing Red Sweatshirt**

The investigative team also looked into the missing red sweatshirt from the police chase and believed they uncovered a conspiracy.

Although testifying officers stated that a pursued suspect wore and discarded a red sweatshirt, the officers said they neither entered the sweatshirt into evidence, nor remembered what happened to it. SCR at 2286–88. Weeks after Browning's murder, while the investigation was ongoing, Gilbert Franklin was arrested for a separate series of non-fatal shootings. *Id.* at 2288. One victim in the series of shootings described the perpetrator as wearing a red hooded sweatshirt and another victim, who knew Franklin, identified him as the shooter. *Id.* at 2289. A police officer involved in one of the shootings was Officer George Rocchio, who was also among the officers who chased the suspects in Browning's murder. *Id.* at 2288.

Petitioner's team theorized that the red sweatshirt discarded by the suspect in Browning's murder *had* in fact been collected, but Officer Rocchio and other police officers obtained it from evidence, destroyed its voucher so they could claim it was

lost, and then used the sweatshirt against Franklin in the unrelated case. *Id.* at 2288–90. They based this theory on the following: (1) the crime scene documentation in the separate Franklin case—which they obtained through a FOIL request—did *not* mention a red sweatshirt recovered at the scene; (2) the shooting victims in the separate Franklin case were convicted felons who may have had incentive to cooperate with a false narrative advanced by the police; (3) an audiotape of an Internal Affairs interview with Officer Rocchio and another officer after the series of shootings—which could have shed light on the officers' initial descriptions of the suspect—was lost; and (4) the NYPD refused to produce the red sweatshirt's voucher from the unrelated Franklin case in response to petitioner's FOIL requests. *Id.* at 2290–92.

**G. Material Witness Order for Concepcion**

In reviewing the court file from Thompson's trial, the investigative team found a material witness order for Concepcion that threatened legal consequences if she did not testify. *Id.* at 2269. The investigative team also identified recent news coverage exposing "the rampant misuse of material witness orders . . . in numerous wrongful convictions in New York City." *Id.* at 2270 n. 11. They believed the order—and potential misuse thereof—helped explain why Concepcion initially told the police that she did not have any information about the shooting but later identified petitioner. *Id.* at 2269–70.

### H. Staley's Testimony from Co-Defendant Franklin's Trial

Petitioner's co-defendant Gilbert Franklin was separately tried for his role in the shooting almost a year after petitioner's conviction. *Id.* at 2297, 2599. The investigative team learned that although Staley testified at petitioner's trial that the person who knocked on the door looking for Browning used a "disguised" or "slang" voice, at Franklin's subsequent trial Staley described hearing a Jamaican accent. *Id.* at 2297–99. Thompson does not speak with a Jamaican accent, but Clark does. *Id.*

### I. Documents from Separate Bank Robbery Investigation

While the Browning murder was being investigated, petitioner was identified as a person of interest in a string of recent bank robberies and was arrested for one such robbery. *Id.* at 2293. Thompson's investigative team gathered documents from the bank robbery case that they believed showed the inculpatory evidence was "non-existent" and suggested the July 4, 1992, shooting was leveraged against him in an effort to bring about "a resolution to [the bank robbery] investigation in the absence of evidence. . . ." *Id.* at 2293–94.

### J. NYPD Officer Stephen Garzone's 2018 Affidavit

On January 22, 2018, Thompson's investigative team obtained an affidavit from NYPD Officer Stephen Garzone, who was the first responding officer who entered Apartment 3F at 151 Jersey Street after the shooting. SCR at 2329.

Officer Garzone attested that he asked Staley—who was injured on the ground but "alert and responsive to [Garzone's] questions"—if he knew who shot him and Staley said he could not identify them. *Id.* at 2330. This statement appeared to contradict Staley's trial testimony that he recognized Thompson during the shooting.

Officer Garzone also said that Staley told him that it was Staley who responded to the knock on the door that allowed the shooters to barge in, *id.* at 2330, contradicting Staley's trial testimony that Browning answered the door.

Finally, Officer Garzone said that he never spoke to ADA Macron about the case and was never called to testify, nor were any of the other original responding officers from the Housing Division who were at the crime scene. *Id.* at 2331. He assumed Staley was held responsible for Browning's murder and "never knew that Foster Thompson had been arrested or associated in any way with the incident." *Id.*

Officer Garzone's 2018 affidavit is contradicted, however, by the fact that he was called by Thompson's legal team to testify at Thompson's first trial. There, Officer Garzone repeatedly stated that Staley did not speak to him at all at the crime scene. *Id.* at 5005–06, 5032; ECF No. 39 at 2. Officer Garzone also stated that he did speak with ADA Macron prior to his testimony. SCR at 5002–03.

## V. State Post-Conviction Relief Proceedings

### A. Thompson's Motion

On April 16, 2018, Thompson moved to set aside his conviction under New York Criminal Procedure Law § 440.10. *Id.* at 2258–60. He alleged several grounds for relief:

#### 1. Actual Innocence

Petitioner argued first that his conviction should be vacated pursuant to N.Y. Crim. Proc. § 440.10(1)(h) because he is actually innocent. *See id.* at 2310. Under New York law, a freestanding claim of actual innocence can provide a basis to set aside a judgment of conviction if a defendant demonstrates with clear and convincing evidence that he is actually innocent of the crimes for which he was convicted. *See People v. Hamilton*, 979 N.Y.S.2d 97, 107–08 (N.Y. App. Div. 2014). Summarizing the evidence he put forth in support of this claim, petitioner highlighted Clark's statements as proof that Clark was the true culprit behind the July 4, 1992, shooting. SCR at 2311. He explained that Clark's admissions were corroborated by Candice's confession; Jackie Holman's observations of "Jamaican Tony wearing the red sweatshirt at the crime scene;" Clark's purported prior confessions to Brenda and to Davina; and testimony from Franklin's trial in which Staley described hearing someone speaking with a Jamaican accent. *Id.* In addition, petitioner claimed Officer Garzone's affidavit established that Staley was a "liar."

*Id.* Petitioner emphasized that "the only physical evidence that was alleged to connect Foster Thompson to the crime" was the missing red sweatshirt and pointed to the "compelling circumstantial evidence" uncovered by the defense investigation that indicated the sweatshirt was "purposefully removed from the crime scene." *Id.* at 2311–12. He also referenced purported evidence of prosecutorial misconduct and the suppression of exculpatory material as further support for his claim. *Id.* at 2312.

**2. Newly Discovered Evidence**

Petitioner's motion next argued that his conviction should be vacated under N.Y. Crim. Proc. § 440.10(1)(g) because of new evidence discovered since his guilty verdict that "will probably change the result if a new trial is granted." *Id.* at 2312–13. Petitioner based this claim on: (1) Clark's video statement; (2) Brenda's affidavit; (3) Clark's purported confession to Davina; (4) Candice's video statement; (5) Officer Garzone's affidavit; (6) the Holman DD5; (7) petitioner's theory about the manipulation of the red sweatshirt; and (8) documents from the separate bank robbery case. *See id.* at 2276–95.

**3. *Brady* Violations**

Petitioner also contended that the prosecution violated his due process rights pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding materially exculpatory evidence.

First, petitioner argued that the prosecution suppressed the Holman DD5, which he said "contained Jackie Holman's observation of Jamaican Tony in the red sweatshirt that was wrongly ascribed to Foster Thompson." SCR at 2314. He claimed that the failure to disclose the report "foreclosed any opportunity by the defense to seek its admission, identify [Detective] Ruiz as a witness, or conduct its own investigation, including trying to interview Holman prior to her death and track down leads from her statement prior to trial." *Id.* at 2315.

Second, petitioner argued that the police's failure to preserve the suspect's red sweatshirt—and the alleged conspiracy to remove the red sweatshirt from the crime scene and plant it to prosecute co-defendant Franklin in an unrelated case—constituted a *Brady* violation. *Id.* at 2314; *see also id.* at 2286–92.

Third, petitioner claimed the prosecution violated *Brady* by suppressing Staley's testimony in co-defendant Franklin's trial for the Browning shooting that he heard someone speak with a Jamaican accent. *Id.* at 2314. Petitioner also argued the prosecution withheld other "key impeachment evidence" that would have undermined Staley's testimony, including an "undisclosed quid pro quo" that afforded Staley "a deal of leniency in exchange for his testimony." *Id.* at 2314–15, 2317.

Fourth, petitioner maintained that the prosecution withheld "key impeachment evidence" that would have undermined Concepcion's testimony, including not only

the Holman DD5 but also the fact that Concepcion was compelled to testify under a material witness order. *Id.* at 2314–15, 2269.

**4. Prosecutorial Misconduct**

Finally, petitioner argued that his conviction should be vacated because his right to a fair trial was violated due to prosecutorial misconduct by former ADA Macron. *Id.* at 2315. Specifically, petitioner emphasized Macron's purported non-disclosure of the evidence discussed above and his knowing reliance on allegedly perjured testimony from Staley and Concepcion. *Id.* at 2317–18. Petitioner reasoned that the suppression of exculpatory evidence and subornation of perjury operated hand in hand: non-disclosures boosted the credibility of the witnesses by insulating them from evidence that could have been used to impeach or otherwise contradict them. *See id.*

In addition, petitioner faulted Macron for not calling Officer Garzone as a witness and for his alleged false statement that Officer Garzone was unavailable to testify. *See id.* at 2317. Macron was at this point representing Staley in private practice, and petitioner also accused him of "block[ing]" petitioner's post-trial investigation when the defense team tried to interview Staley. *See id.* at 2318, 2262 n. 1.

Petitioner further claimed that the District Attorney improperly appointed Macron as a special prosecutor in 2016, despite concerns about Macron's conduct in Thompson's case. *See id.* at 2262 n. 1, 2268 n. 9.

**B. § 440.10 Motion Court's Decisions**

**1. October 12, 2018, Decision Rejecting Prosecutorial Misconduct Claim and Most *Brady* Claims**

On October 12, 2018,[11] the motion court issued the first of several decisions denying Thompson relief. *Id.* at 5207–19. That decision addressed—and rejected—his prosecutorial misconduct claim and most of his *Brady* claims. *Id.*

The motion court first rejected petitioner's claim that former ADA Macron was improperly appointed, explaining that the District Attorney's Office did not have input into the appointment. *Id.* at 5211. Next, the court discarded the claims that Macron obstructed petitioner's attempts to interview Staley and otherwise committed misconduct by representing Staley in private practice. *Id.* at 5212. The court emphasized that the claims did not provide a basis for relief because "Macron's current representation could not have affected the prior prosecutions." *Id.* at 5212.[12]

[11] While the order is dated October 12, 2017, it was in fact from 2018, as confirmed in the state court's subsequent orders. *See*, *e.g.*, SCR at 5243.

[12] Although the issue of former ADA Macron's private representation of Staley during the § 440.10 motion proceedings is not before me, it raises questions about a conflict of interest.

The court then rejected petitioner's *Brady* argument regarding Staley's inconsistent testimony about the Jamaican accent, explaining that the prosecution did not suppress this information because defense counsel elicited it from Staley on cross-examination during the June 1994 joint trial. *Id.* at 5213–14.

Similarly, the court held that the prosecution did not violate *Brady* by suppressing an "implied quid pro quo deal" with Staley because Staley receiving transactional immunity was discussed at length before the jury and noted in a jury instruction. *Id.* at 5214–16. The court also found that the claim was procedurally barred because it was not raised on direct appeal. *Id.* at 5216.

The court further rejected the *Brady* claim as to Concepcion and the material witness order. It explained that testimony under a material witness order was not *Brady* evidence under New York law and, regardless, the defense was aware of the existence of the material witness order based on an on-the-record discussion during the June 1994 joint trial. *Id.* at 5217–18. The court also noted that, despite news reports about misuse of material witness orders by the King's County District Attorney's Office, there was "no evidence of any improper conduct by the *Richmond* County District Attorney's Office." *Id.* at 5218 (emphasis added).

Finally, the court rejected the allegation of misconduct regarding the failure to call Officer Garzone as a witness, finding that the prosecution was not obligated to call him or any other witness and that the defense could have called him as a

witness, as it did in a preceding joint trial. *Id.* at 5218–19. In a subsequent order dated February 8, 2019, the motion court granted an evidentiary hearing and directed petitioner to call Officer Garzone as a witness to discuss the apparent inconsistencies between his testimony at the joint trial and his affidavit. *Id.* at 5243–44. Petitioner did not call Officer Garzone to testify at the eventual hearing.[13]

### 2. April 12, 2019, Decision Rejecting More Claims

The motion court next rejected petitioner's *Brady* claim based on the Holman DD5 and his claim regarding the red sweatshirt. *Id.* at 5249–50.

First, in rejecting petitioner's *Brady* claim regarding the Holman DD5, the court explained that the information in the DD5 was hearsay and not admissible as a business record because Holman was not under a business duty to report the information. *Id.* at 5253. Noting that inadmissible evidence may nonetheless be material under *Brady* if it could lead to admissible evidence or be used as a tool for effective cross-examination, the court found that the Holman DD5 satisfied neither category. *Id.* While petitioner had argued that prompt production of the Holman DD5 would have allowed the defense team to speak to Holman and discover other admissible evidence, the court called this "conjecture without a basis" because

[13] Counsel for petitioner later explained that they discontinued advancing arguments based on Officer Garzone's affidavit once they became aware of the inconsistencies between his affidavit and his prior testimony. *See* ECF No. 38 at 10–11.

petitioner did not proffer specific evidence that could have been discovered. *Id.* Further, the court reasoned that it "[could not] think of any further evidence that could be discovered" because—based on Brenda Thompson's account of the night of the murder—the defense was already aware of Clark as an alternative suspect. *Id.* Petitioner also argued that the Holman DD5 could have been used as a tool for effective cross-examination, allowing the defense to question the testifying police officers about their failure to pursue alternate suspects including Clark and about the conduct of the investigation. *Id.* at 5253–54. The court rejected that line of argument as well, finding that the DD5 "was not required" for effective cross-examination: "Since the Defendant already knew that Tony allegedly confessed, both avenues of cross-examination were already available." *Id.*

The court also rejected petitioner's claim regarding the missing red sweatshirt, finding it amounted to "conjecture and conspiracy theories without any basis in law." *Id.* at 5255–57. Although petitioner raised the missing red sweatshirt as a *Brady* claim, *see id.* at 2314, the court seemingly did not examine the allegations within the framework of *Brady* but rather as a claim of evidence tampering by the police, *see id.* at 5255–57. The court found the claim was "incredible as a matter of law" and

also determined it was procedurally barred because petitioner should have raised it on direct appeal. *Id.*[14]

Finally, the court found that Thompson made prima facie showings of actual innocence and new evidence warranting vacatur, and it ordered an evidentiary hearing on those issues. *Id.* at 5254–59.

### 3. Further Briefing and Evidentiary Hearing

Petitioner subsequently filed a brief seeking to admit Clark's video statement and to subpoena Staley and Macron to testify at the evidentiary hearing. *Id.* at 5275.

In seeking to subpoena Staley, petitioner argued that Staley's testimony was vital because respondent would rely on Staley's identification of petitioner to argue petitioner had not met his burden for his actual innocence claim. *See id.* at 5283–85; 5308–11. The court declined to sign a subpoena, reasoning that petitioner was not entitled to rehash Staley's trial testimony absent a "proffer" that he "would state something other than what he already stated in the trial testimony." *Id.* at 2029–30.[15]

In seeking to subpoena Macron, petitioner argued that he was entitled to call Macron to explore what witnesses told Macron during interviews he conducted at the time of petitioner's trial. *Id.* at 5284–85. He also argued that Macron personally

[14] Petitioner sought to reargue the court's denial of his claims regarding the red sweatshirt, *see* SCR at 5263–69, but the court denied the motion, *id.* at 5303.

[15] Petitioner later moved to reargue the court's denial of petitioner's request to call Staley as a witness. SCR at 5480–81. The court denied the motion. *Id.* at 5459–62.

representing Staley years after petitioner's trial "present[ed] serious ethical and conflict of interest issues," *id.* at 5285, and suggested that Macron had "blocked" Staley from participating in the evidentiary hearing, *id.* at 5313. The court denied Thompson's subpoena request, calling it a request "to go fishing." *Id.* at 5313–14.

In July and August of 2019, the motion court held an evidentiary hearing on petitioner's actual innocence and newly discovered evidence claims. *See id.* at 5316. As part of that hearing, the court first considered the admissibility of Clark's video statement as a statement against penal interest and heard testimony from Dowd on the process of obtaining the video.

Dowd described that Clark's daughter Davina Thompson, at Dowd's behest, called Clark to speak about the Browning murder and Clark declined to speak about it over the phone. *Id.* at 5329. Dowd determined that he needed to get Clark and Davina to have a conversation in person and try to record it, prompting Dowd to plan for him and Davina to travel to Jamaica. *Id.* at 5329–31. He instructed Davina to tell Clark she had won a trip to a resort, where she would meet Clark. *Id.*

Dowd testified that he and Davina arrived in Jamaica on February 25, 2017. *Id.* at 5330–31. When they got to the resort, Dowd went to the hotel room to hide a cube recording device. *Id.* at 5333. Davina and Clark later entered the room and Davina soon after "came out hysterical" and left. *Id.* at 5333–34. Dowd decided to enter the room and explain the nature of his presence. *Id.* at 5334–35. Clark was

hostile, but after a while, he calmed down. *Id.* at 5335–36. Dowd showed him a video of Candice's interview with the District Attorney's Office to try to convince him to tell his side of the story. *Id.* at 5337–39. While Clark initially denied any knowledge of the events that Candice described, he later admitted to some involvement and started to relay his account. *Id.* at 5336–41. Dowd said he clearly explained to Clark the incriminating nature of Clark's remarks, and Clark, after much cajoling, provided video and written statements on his role in an armed robbery. *Id.* at 5339, 5342–44.

Dowd explained to the motion court that he did not videotape his initial conversations with Clark because he was trying to persuade him to stay in the room and talk to him. *Id.* at 5340, 5356–57. He also explained that the cube recorder he had placed in the room earlier in the day was missing when he tried to retrieve it; he assumed Clark saw it and got rid of it. *Id.* at 5340.

Following Dowd's testimony about the circumstances surrounding Clark's video and after hearing additional arguments from counsel, the court admitted Clark's video as a statement against penal interest. *Id.* at 5474–75.

Candice and Brenda Thompson also testified at the evidentiary hearing. *See id.* at 5386–5408 (Candice), 5408–44 (Brenda).

Candice's testimony was less comprehensive than her videotaped 2016 interview with the District Attorney's Office, covering fewer details about the night

of the shooting and its lead-up and aftermath. Her account broadly tracked her prior interview, though with several discrepancies. Most notably, in this retelling: (1) she was aware of the robbery plans before leaving the Bronx, *id.* at 5393, rather than after the group arrived in Staten Island; (2) she made no mention of a man who tried to convince Clark to give up the robbery plans; (3) she saw the guns while Kwan was holding the bookbag, *id.* at 5395–96, whereas she said in 2016 she never saw them; (4) she heard, and possibly saw, a man open the door to Apartment 3F in response to Browning's knocking, *id.* at 5398; and (5) she called out to Kwan to meet her on top of a nearby abandoned building after the shooting, *id.* at 5399–5400, rather than the other way around. Candice also added in her testimony that she had tried to tell Thompson's trial counsel her story during the initial trial phase; she did not remember the full response but said the attorney told her she "was 14 years old" and did not put her on the stand. *Id.* at 5408.

Brenda's testimony largely corroborated her affidavit. In this retelling, however, she said that Clark confessed to her in the presence of Lynette and three grandchildren (but not Candice). *Id.* at 5427–28. And while Brenda's affidavit stated that Lynette and Tony had been living with her at the time, *id.* at 2323–24, she testified that they had moved out six months earlier, *id.* at 5428. In addition, Brenda gave varying answers on when she learned of Candice's purported involvement in

the crimes, ultimately stating she did not know Candice had been there until a few years earlier. *Id.* at 5442–44.

On cross-examination, Brenda was also questioned about her conduct during petitioner's trials. *Id.* at 5432–39. Brenda denied that she made statements in the courthouse bathroom about the credibility of Concepcion's testimony that caused a mistrial in petitioner's first trial. *Id.* at 5432–33. And she pushed back on characterizations of an exchange between her and the trial judge at the beginning of petitioner's third trial, prompting the Assistant District Attorney to attempt to refresh Brenda's recollection with portions of the trial transcript. *See id.* at 5433–39.

#### 4. Post-Hearing Briefing and February 13, 2020, Decision Denying § 440.10 Motion

Petitioner submitted post-hearing briefing, arguing (1) that his conviction should be vacated in light of newly discovered evidence; (2) in the first instance, that his trial counsel was constitutionally ineffective for failing to call Brenda and Candice as exculpatory witnesses; and (3) that the § 440.10 court improperly precluded petitioner from proving his actual innocence by refusing to allow him to subpoena Staley. *See* SCR at 5482–5503.

The District Attorney moved to strike the ineffective assistance of counsel claim as procedurally barred, and the court granted the motion. *Id.* at 5564–66. The court reasoned that petitioner should have included the claim in his original motion and not after numerous decisions and an evidentiary hearing. *Id.* The court did,

however, direct petitioner to file another § 440.10 motion raising the ineffective assistance of counsel claim and stated that its instant decision would not preclude a subsequent motion. *Id.* Petitioner apparently did not file another § 440.10 motion raising the ineffective assistance of counsel claim.

In its final decision on February 13, 2020, the § 440.10 court rejected petitioner's actual innocence and newly discovered evidence claims. *Id.* at 5567–5604.

The § 440.10 court addressed actual innocence first, finding that Thompson failed to meet his burden and that this failure could not be attributed to Thompson's inability to subpoena Staley to testify at the evidentiary hearing. *Id.* at 5589–90.

The court found that neither Candice Thompson nor Brenda Thompson gave credible testimony.[16] *Id.* at 5590. As to Candice, the court noted that she "appeared confused, distracted, and inattentive during portions of her testimony," and that her credibility was further undermined by aspects of her testimony that contradicted trial witnesses as well as Brenda's testimony. *Id.* at 5591. As to Brenda, the court explained that she contradicted Candice's testimony in "material" ways; that she was an interested witness as petitioner's mother; and that "[h]er lack of impartiality and credibility [was] also apparently [] an issue throughout the litigation," referencing

[16] The court did not consider any testimony related to Davina Thompson because she did not testify at the evidentiary hearing. SCR at 5570, 5593 n. 9.

concerns with her conduct during two of petitioner's trials. *Id.* at 5591–93. The court highlighted "a glaring and insurmountable inconsistency" between both Brenda and Candice's testimony and Clark's statements: Brenda and Candice testified that they were told that Clark shot Browning, but Clark did not admit to shooting her in his statements. *Id.* at 5593.

The court also discredited Clark based on inconsistencies that diminished the reliability of his confession and "incredible omissions and gaps" within his statements that "cannot be ignored." *Id.* at 5593–94. In the court's view, Clark was "attempting to thread a needle of giving enough information to free [Thompson] while still not implicating himself." *Id.* at 5593.

The court determined that petitioner's "proffered evidence did not demonstrate, by clear and convincing evidence," that he was factually innocent and, "[a]t best, simply create[d] doubt or provide[d] conflicting evidence" regarding his guilt. *Id.* at 5590; *see also id.* at 5594. The court credited the prosecution's trial witnesses as reliable. *Id.* at 5596–99. It stressed that Staley, Concepcion, and Wolfe all testified that Concepcion brought a cigarette up to Browning, that they had no reason to perjure themselves, and that it was more logical to find that Browning was already inside Apartment 3F before the shooting—undermining Candice and Clark's accounts that Browning was used in a ruse to gain entry to the apartment. *Id.* The court cast additional doubt on Clark's involvement in the events by noting that he

said in his video statement that he was five feet tall but no evidence in the record suggested that "a participant [in the shooting] was diminutive." *Id.* at 5599.

The court next rejected petitioner's motion to vacate his conviction on the basis of newly discovered evidence. *Id.* at 5599–5604. It found that Brenda and Candice's statements were not newly discovered because Brenda and Candice reportedly informed Thompson's trial counsel before trial of Clark's supposed involvement in the shooting. *Id.* at 5600–01. It also found that Clark's video and written statements did not constitute newly discovered evidence because he allegedly confessed to both Brenda and Lynette Thompson prior to petitioner's trial. *Id.* at 5602–03.[17] Moreover, the court reasoned that the various evidence proffered as newly discovered "would not have probably changed the result at a new trial" because it was low-quality and paled against the prosecution's "extensive reliable evidence" offered at trial. *Id.* at 5603–04.

Thompson sought leave to appeal the § 440.10 court's orders, and his application was denied on August 6, 2020. *Id.* at 5618. The Appellate Division denied Thompson's motion for reconsideration on October 19, 2020. *Id.* at 5643.

---

[17] The court also addressed a statement from Davina Thompson, finding it could not be considered newly discovered evidence because at the evidentiary hearing "there was no testimony provided with respect to the circumstances surrounding" her statement and she was not called as a witness. *Id.* at 5604.

### VI. Habeas Proceedings

On December 1, 2020, Thompson filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. The petition raised four grounds for habeas relief: (1) actual innocence (as an independent ground for relief); (2) *Brady* violations as to the Holman DD5 and the red sweatshirt; (3) deprivation of due process by the § 440.10 court by precluding petitioner from subpoenaing Staley and Macron to testify at the evidentiary hearing on his actual innocence claim; and (4) ineffective assistance of counsel based on trial counsel's failure to call Brenda and Candice to testify. ECF No. 9 at 33. On March 21, 2023, in an effort "to resolve petitioner's [pending] *Brady* claim," petitioner moved to compel production of a police voucher for the red sweatshirt that the police allegedly recovered in co-defendant Franklin's unrelated case. *See* ECF No. 35 at 1. On August 25, 2025, petitioner also moved for leave to amend his petition "to incorporate newly discovered evidence that materially strengthens his existing *Brady* claim." *See* ECF No. 42 at 1.

## DISCUSSION

### I. Timeliness of Petition

#### A. Statutory Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a person in custody pursuant to a state court judgment generally has

one year from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review" to file a habeas petition. 28 U.S.C. § 2244(d)(1)(A). If a petitioner's claim is based on newly discovered evidence, however, the one-year statute of limitations begins to run on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D).

Thompson's conviction became final ninety days after the New York Court of Appeals denied him leave to appeal his judgment of conviction on April 8, 1998, *see Chambers v. Lilly*, 735 F. Supp. 3d 196, 218 (E.D.N.Y. 2024), and he filed his habeas petition over two decades later, on December 1, 2020, ECF No. 1. He contends that his petition, which involves newly discovered evidence, is timely under 28 U.S.C. § 2244(d)(1)(D), operating in concert with 28 U.S.C. § 2244(d)(2), which pauses the statute of limitations during state post-conviction proceedings.[18] He argues that his § 440.10 motion was "the culmination of a years-long investigation" that ended on January 22, 2018, when investigators obtained Officer Garzone's affidavit. ECF No. 9 at 35. As such, Thompson argues, AEDPA's statute of limitations did not begin to run until January 22, 2018. *Id.* With the tolling of the

[18] Petitioner also argues that any untimeliness is excused because he has made an adequate showing of "actual innocence"—an equitable exception to the statute of limitations set forth by the Supreme Court in *McQuiggin v. Perkins*, 569 U.S. 383 (2013). The issue of actual innocence is discussed *infra*.

time during which petitioner was involved in a pending state post-conviction proceeding—between April 6, 2018, when he filed his § 440.10 motion, and October 19, 2020, when the Appellate Division denied leave to appeal—he suggests the statute of limitations ran for less than one year total and his claims are timely. ECF No. 9 at 35–36.

As both parties agree, petitioner's due process claim regarding the preclusion of testimony at the § 440.10 hearing is timely. Whether petitioner's remaining claims are timely pursuant to 28 U.S.C. § 2244(d)(1)(D), based on the timing of the discovery of the factual predicates of his claims, requires further examination.

While Congress did not define the term "factual predicate" as used in 28 U.S.C. § 2244(d)(1)(D), the Second Circuit has endorsed the definition as the "vital facts . . . without which the claim would necessarily be dismissed" as failing to state a claim. *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (internal quotation marks omitted). "[I]f new information is discovered that merely supports or strengthens a claim that could have been properly stated without the discovery, that information is not a 'factual predicate[.]'" *Id.* (quoting *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007)).

Determining "the date on which the factual predicate . . . is first discoverable is a 'fact-specific' inquiry which requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or

could with due diligence have been discovered." *Id.* at 534. This means timeliness "turns on when [a] petitioner could have, with the exercise of due diligence, discovered the *facts* underlying the claim, not when [a] petitioner actually received a particular document on which he relies in pressing that claim." *Romano v. Stanford*, No. 16-CV-5884 (RPK), 2022 U.S. Dist. LEXIS 85233, at *36 (E.D.N.Y. 2022). The burden is on a petitioner to demonstrate that he exercised due diligence in discovering the factual predicate of his claim. *Shabazz v. Filion*, 402 Fed. App'x 629, 630 (2d Cir. 2010).

Here, petitioner argues that although he "may have known some of the background facts at or about the time of trial, he did not know of, or possess documentation of, enough proof of his claims to go to court" until the conclusion of his post-trial investigation in 2018. *See* ECF No. 15 at 17–18. This argument is unpersuasive.

Petitioner knew the facts underlying his ineffective assistance of trial counsel claim—that defense counsel failed to call Brenda and Candice as witnesses—at the time of his trial. Moreover, even if petitioner first learned at the § 440.10 evidentiary hearing that trial counsel allegedly did not call Candice to testify based on a misunderstanding of law regarding her youth, the claim would still be untimely because his investigative team could have acquired this information from Candice much earlier with due diligence.

Petitioner was also aware of the facts underlying his *Brady* claim regarding the Holman DD5 at least as early as 2016, when the District Attorney turned over this document to him. No other facts would have been "vital" to prevent him from pleading a *Brady* claim within one year of that date.

It is less clear when the factual predicate of petitioner's *Brady* claim regarding the red sweatshirt was, or could have been, discovered. Respondent emphasizes that "[d]efense counsel knew that the police had recovered a red sweatshirt that went missing because he questioned [a testifying detective] about that matter at petitioner's trial." ECF No. 11-1 at 5. In contrast, petitioner argues that the factual predicate for his claim *also* comprised facts he gleaned from documents from the unrelated Franklin case following a FOIL request—without which he could not have plausibly alleged that the evidence was suppressed under *Brady*. *See* ECF No. 15 at 13–14 (knowledge that "the red sweatshirt 'had gone missing' . . . is not equivalent to knowing . . . that the shirt had turned up at another crime scene, which would be compelling proof that its disappearance was due to willful suppression rather than being lost inadvertently"); *see also id.* at 18.

Assuming there were indeed additional "vital facts" beyond the missing sweatshirt itself to make out a *Brady* claim, it is not a given that those facts would necessitate "recei[pt] [of] [] particular document[s]" via petitioner's FOIL request, *see Romano*, 2022 U.S. Dist. LEXIS 85233, at *36; whatever information led

petitioner to file the FOIL request in the first place may have been sufficient to serve as the factual predicate. It also is not apparent when he obtained the documents from his FOIL request, beyond that it was sometime before he obtained the Garzone affidavit on January 22, 2018. *See* ECF No. 9 at 35 (stating the Garzone affidavit marked the conclusion of petitioner's post-trial investigation); SCR at 2291 (stating, in a filing dated April 16, 2018, that "[t]he police paperwork with regards to the Franklin shootings" had been "recently produced"). Even if I were to presume that petitioner received the documents just one day earlier on January 21, 2018, the burden is still on petitioner "to prove that he could not have discovered the factual predicate for his *Brady* claim[] prior to [that date]." *See Rivas*, 687 F.3d at 537. Because he fails to do so, I find his *Brady* claim as to the red sweatshirt untimely.[19]

---

[19] Even if petitioner demonstrated that he received the documents within a potentially timely range *and* he could not have discovered the factual predicate sooner, his *Brady* claim would fail on the merits. It is unclear whether the § 440.10 court in fact adjudicated this *Brady* claim on the merits. *See generally* SCR at 5207–19 (Oct. 12, 2018, Order), 5242–44 (Feb. 8, 2019, Order), 5248–58 (Apr. 12, 2019, Order), 5567–5606 (Feb. 13, 2020, Order #2). It is therefore likewise unclear whether the "highly deferential standard for evaluating state-court rulings" established under AEDPA would apply. *See Contreras v. Artus*, 778 F.3d 97, 106 (2d Cir. 2015) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). In any event, the claim would fail even on *de novo* review. Under *Brady*, petitioner must show that: (1) the evidence at issue was favorable to him; (2) the evidence was suppressed by the government; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir. 1995). He cannot, however, show that the red sweatshirt was suppressed rather than lost. It is also speculative that the sweatshirt would have been favorable; despite petitioner's suggestions, *see* ECF No. 15 at 16–17, it is unknown if the sweatshirt would have

Finally, the facts underlying petitioner's actual innocence claim "were known, or could with due diligence have been discovered" earlier than petitioner suggests. Setting aside for the moment whether this freestanding actual innocence claim is in fact cognizable, petitioner himself acknowledges that "[t]he revelation of Jamaican Tony's guilt" during post-trial investigations "was not new to Foster Thompson and his family" because he alleges Clark confessed to Brenda "within hours of the shootings" in 1992. ECF No. 9 at 4. Petitioner argues that he needed to gather additional evidence in order to bring an actual innocence claim, but even assuming such a claim were cognizable on habeas review, "[Section] 2244(d)(1)(D) 'does not convey a statutory right to an extended delay . . . while a habeas petitioner gathers every possible scrap of evidence . . . that might support his claim.'" *Irizarry v. LaClair*, No. 17-civ-00739 (LAP), 2018 U.S. Dist. LEXIS 127063, at *9–10 (S.D.N.Y. July 30, 2018) (alterations in original) (quoting *Lucidore v. N.Y. State Div. of Parole*, No. 99 Civ. 02936 (AJP), 1999 U.S. Dist. LEXIS 11788, at *20 (S.D.N.Y. Aug. 3, 1999), *aff'd*, 209 F.3d 107 (2d Cir. 2000)). It is clear that the factual predicate for any actual innocence claim arose prior to petitioner's receipt of Officer Garzone's affidavit in 2018. Assuming *arguendo* that petitioner required Clark's statements (obtained in February 2017) to state his claim, petitioner fails to

---

contained forensic evidence that would exclude him or if it would have been demonstrably smaller than his clothing size at the time.

meet his burden of demonstrating he exercised due diligence to discover this evidence, particularly with little explanation given for the delay in locating Clark until 2016. And regardless, petitioner still did not file his habeas petition within one year of obtaining Clark's statements. For all of these reasons, petitioner's actual innocence claim is untimely.

Petitioner attempts to save his untimely claims by suggesting that, when determining timeliness, "the proper focus is not when petitioner knew of one or more facts underlying each specific claim, but on when he obtained the knowledge and proof necessary to file the *totality* of his claims." ECF No. 15 at 18. This view stands in direct opposition to the Second Circuit's instruction that courts should "analyze the factual bases of *each claim*" to determine timeliness. *Rivas*, 687 F.3d at 534 (emphasis added); *see also Clemente v. Lee*, 72 F.4th 466, 469 (2d Cir. 2023) (Section 2244(d)(1) statute of limitations requires a claim-by-claim approach). Petitioner's proposal would also eviscerate the very notion of a statute of limitations here by making the factual predicate timing beholden to the whims of the habeas petitioner in deciding when their investigation is complete. While petitioner is free to question the fairness of AEDPA's statute of limitations and its prioritization of finality, his argument is foreclosed by AEDPA and by legal precedent.

In sum, petitioner's due process claim is timely and his remaining claims are untimely.

**B. Equitable Tolling**

Petitioner argues in the alternative that the statute of limitations should be equitably tolled "for the duration of [his] post-trial investigation," such that all of his claims would be timely. ECF No. 15 at 19 n.8. Acknowledging that such relief is "rare," he states that it is nonetheless available "where the petitioner 'has acted with reasonable diligence throughout the period he seeks to toll,'" and he asserts he has satisfied this standard. *See id.* (quoting *Green v. United States*, 260 F.3d 78, 82 (2d Cir. 2001)). Setting aside whether petitioner has indeed done so, there is a second condition that must also be met to justify equitable tolling: demonstrating that "some extraordinary circumstance stood in his way' and prevented timely filing [of his petition]." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004) ("To qualify for [equitable tolling], the petitioner must establish that extraordinary circumstances prevented him from filing his petition on time, and that he acted with reasonable diligence throughout the period he seeks to toll." (internal quotation marks omitted)).

Whether a petitioner faced an extraordinary circumstance warranting equitable tolling "depends not on the uniqueness of a party's circumstances or the outrageousness of what they endured, but rather . . . the severity of the obstacle impeding compliance with a limitations period." *Doe v. United States*, 76 F.4th 64,

72 (2d Cir. 2023) (internal quotation marks omitted). The requisite severity is a high bar. For example, attorney negligence constitutes an extraordinary circumstance only where it is "so egregious as to amount to an effective abandonment of the attorney-client relationship." *Rivas*, 687 F.3d at 538. Likewise, physical and psychiatric medical conditions *may* rise to the level of an extraordinary circumstance "depending on the facts presented." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011) (finding an extraordinary circumstance in a "significant" period of hospitalization where the petitioner "underwent six surgeries, requiring him to be confined to bed and heavily medicated"). Other extraordinary circumstances recognized by the Second Circuit evince a similar gravity. *See, e.g.*, *Doe*, 76 F.4th at 72 (reasonable fear of retaliation by law enforcement); *Valverde v. Stinson*, 224 F.3d 129, 133–34 (prison officials' intentional confiscation of habeas petition and related legal papers shortly before filing deadline).

Here, petitioner identifies no extraordinary circumstance that prevented him from filing any of his claims in a timely manner, nor do the facts suggest one. As to his *Brady* claims in particular, some courts have suggested that "the same facts supporting a *Brady* claim might [] support the application of the doctrine of equitable tolling." *See, e.g.*, *Wardlaw v. Cain*, 541 F.3d 275, 279 (5th Cir. 2008). But a *Brady* claim does not itself constitute an extraordinary circumstance meriting equitable tolling. *See Ford v. Gonzalez*, 683 F.3d 1230, 1237–38 (9th Cir. 2012) (no

entitlement to equitable tolling "merely" based on alleged *Brady* violation because otherwise "AEDPA's one-year statute of limitations could never bar a *Brady* claim"); *see also, e.g.*, *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111, 113 (2d Cir. 2000) (dismissing *Brady* claim as time-barred). If alleged prosecutorial misconduct prevents a petitioner from obtaining the facts to support a *Brady* claim, the remedy lies not in equitable tolling but rather in the statute of limitations—by calculating the time to file from the time the petitioner discovers those relevant facts under 28 U.S.C. § 2244(d)(1)(D). *See Jefferson v. United States*, 730 F.3d 537, 549 (6th Cir. 2013) (citing *Rinaldi v. Gillis*, 248 Fed. Appx. 371, 380 (3d Cir. 2007)). Any alleged nondisclosure does not affect the petitioner's ability to file a timely habeas petition after having discovered the facts necessary to make out the claim. *Rinaldi*, 248 Fed. Appx. at 380.

With no grounds for equitable tolling, petitioner's untimely claims may not be entertained unless he establishes a basis for bypassing the bar posed by the statute of limitations.

**C. Actual Innocence**

Petitioner first raises actual innocence as a freestanding claim. *See* ECF No. 9 at 36. The Supreme Court, however, has never held that a freestanding actual innocence claim exists in non-capital cases. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas

relief based on a freestanding claim of actual innocence."). Thus, the state court's rejection of petitioner's freestanding actual innocence claim cannot be "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"—which would be necessary under AEDPA for habeas relief to be available. 28 U.S.C. § 2254(d)(1); *see also* *Cosey v. Lilley*, 460 F.Supp.3d 346, 381 (S.D.N.Y. 2020), *aff'd on other grounds by* 62 F.4th 74 (2d Cir. 2023). Petitioner's standalone actual innocence claim therefore must be rejected outright.[20]

Petitioner also argues that his showing of actual innocence "is at minimum sufficient to enable him to overcome both any timeliness objections by the People and any procedural bars to resolution of his claims." ECF No. 9 at 34–36, 36 n. 15. Because habeas corpus "is, at its core, an equitable remedy," *Schlup v. Delo*, 513

[20] Petitioner relies on *In re Davis*, No. CV409-130, 2010 WL 3385081 (S.D. Ga. Aug. 24, 2010), and *DiMattina v. United States*, 949 F. Supp. 2d 387, 414–21 (E.D.N.Y. 2013), to argue that a freestanding actual innocence claim exists and is cognizable here. ECF No. 9 at 36 n.15. Yet the Second Circuit explicitly has not endorsed the analyses from those two cases. The Court recently explained that "[n]o binding authority has adopted" the district court's test from *In re Davis* and declined to do so, and it also noted that the district court in *DiMattina* "speculat[ed]" about the standard of proof for a freestanding actual innocence claim but did not actually apply that standard to grant habeas relief. *Jimenez v. Stanford*, 96 F.4th 186, 190 n.30 (2d Cir. 2024).

Regardless, as described *infra*, petitioner cannot satisfy the actual innocence gateway standard. Since any hypothetical freestanding actual innocence claim would require even *greater* proof of his actual innocence than a gateway claim, he necessarily cannot meet the higher standard. *See House v. Bell*, 547 U.S. 518, 555 (2006).

U.S. 298, 319 (1995), an actual innocence claim can provide a "gateway" to have an "otherwise barred constitutional claim considered on the merits," *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *see also Hyman v. Brown*, 927 F.3d 639, 655 (2d Cir. 2019). This gateway would allow a petitioner to bypass AEDPA's one-year statute of limitations. *McQuiggin*, 569 U.S. at 386.

I will analyze whether petitioner's actual innocence claim may permit resolution of his untimely *Brady* and ineffective assistance of counsel claims.

**1. Gateway Analysis**

The actual innocence gateway standard is "deliberately demanding." *Hyman*, 927 F.3d at 656 (internal quotation marks omitted). "[T]enable actual-innocence gateway pleas are rare," and the gateway is available only in the "extraordinary case." *McQuiggin*, 569 U.S. at 386, 392.

To succeed, a petitioner must present both "credible" and "compelling" new evidence that he is actually innocent. *See House v. Bell*, 547 U.S. 518, 522, 537 (2006); *Rivas*, 687 F.3d at 541. AEDPA adds another hurdle to the analysis, providing that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Thus, "in the context of a gateway claim of actual innocence under *Schlup*, . . . a state court's factual findings are [] rebuttable only upon a showing of clear and convincing evidence of error." *Cosey*, 62 F.4th at 82–83. Moreover,

> [W]here . . . the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part. This is especially so when the court resolved issues like witness credibility, which are factual determinations for purposes of Section 2254(e)(1).

*Id.* at 83 (quoting *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010)).

Petitioner must therefore demonstrate that, despite the § 440.10 court's evidentiary hearing and detailed order, the state court clearly and convincingly erred in rejecting new evidence as not credible, and petitioner's credible new evidence provides legally compelling proof of his actual innocence.

**a. Credibility of New Evidence**

An actual innocence claim is "credible" if it is supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "[T]he habeas court must determine whether the new evidence is trustworthy by considering it both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." *Cosey*, 62 F.4th at 82 (quoting *Doe*, 391 F.3dat 161–62).

To support his actual innocence claim, petitioner advances new evidence in the form of testimony from his niece, Candice Thompson; written and video statements from David Clark; and the previously undisclosed DD5 detailing a police interview with now-deceased witness Jackie Holman—all to support a theory of

Clark as an alternate suspect.[21] *See* ECF No. 9 at 27, 39–41. The § 440.10 court found none of it credible, and these credibility findings warrant deference under AEDPA unless they are clearly and convincingly wrong.

To recount and expand, the § 440.10 court found that Candice "appeared confused, distracted, and inattentive during portions of her testimony" at the evidentiary hearing and highlighted that (1) she testified that Browning knocked on the apartment door, contradicting Staley, Concepcion, and Wolfe's testimony that Concepcion was the person who knocked; (2) she testified that she immediately told her grandmother Brenda Thompson that she had been at the scene of the crime, contradicting Brenda's testimony that she did not know about Candice's involvement until years later; and, (3) in a "glaring and insurmountable inconsistency," Candice testified that she was told that Clark shot Browning, but Clark "does not even admit that he fired his weapon." SCR at 5590–91, 5593. The court also noted that Candice initially referred to Clark as "Japanese Tony" before

---

[21] There is a split among circuit courts on "whether 'new' includes only 'newly discovered' evidence—evidence that was not *available* at the time of trial—or more broadly encompasses 'newly presented' evidence—all evidence that was not *presented to the jury* during trial." *Lopez v. Miller*, 915 F. Supp. 2d 373, 400 n.16 (E.D.N.Y. 2013) (collecting cases). The Second Circuit has not explicitly endorsed either standard. *See Jimenez*, 96 F.4th at 184 n.23. Thus, it will be assumed that it is sufficient for a petitioner to offer "newly presented evidence," and I will consider the reliability of all of evidence petitioner raises here—including evidence from Candice that is not newly discovered—because it was not presented at petitioner's trials. *See*, *e.g.*, *Rosario v. LaClair*, 2024 U.S. Dist. LEXIS 186297, at *33 n.11 (S.D.N.Y. Oct. 11, 2024) (adopting the same approach).

switching to "Jamaican Tony" after Thompson's counsel used that moniker. *Id.* at 5583 n.3.

The court also found Clark not credible, focusing on inconsistencies and omissions in his statements. Again, Clark did not actually admit to shooting Browning, nor did he address whether he made such an admission to Brenda Thompson on the night of the incident, as Brenda claimed. *Id.* at 5593–94. His account of where the group met Cynthia Browning and whether he brought or was given a gun also differed from that of Candice.[22] *Id.* The court further noted that Clark's written and video statements diverged regarding the order in which he and Kwan entered the apartment, and it was only in the video that he said he attempted to return fire but his gun was not working. *Id.* at 5588, 5594. In addition, the court took issue with the fact that, in the video statement, Clark "apparently was never questioned . . . [about] whether his gun jammed" and did not discuss whether, as Brenda claimed, Cynthia Browning grabbed onto his leg and asked for help. *Id.* at 5595. The court considered "the most glaring omission" to be the missing cube recording device: Because Dowd's interview with Clark lasted over six hours but resulted in just a nine-minute video statement, the device "would have been an invaluable piece of evidence" in trying to settle "unresolved issues" in Clark's

[22] The § 440.10 court's February 13, 2020, order mistakenly references a statement by Browning, instead of Candice. SCR at 5594.

account. *Id.* In general, the § 440.10 court posited that Clark was attempting to exculpate petitioner without incriminating himself for the murder. *Id.* at 5593.

Finally, the court did not consider the Holman DD5 in its actual innocence analysis, because it found the DD5 was "neither reliable nor was it submitted as an exhibit in support of the [] hearing" on the actual innocence and newly discovered evidence claims. *Id.* at 5589 n.5.

**i. Candice Thompson**

I accept the § 440.10 court's findings that Candice's testimony was not credible. The § 440.10 court held an evidentiary hearing and "explained its reasoning with [] care," and petitioner has not cleared the "especially" high bar to establish clear and convincing evidence of an error in the state court's credibility determination.[23] *See Cosey*, 62 F.4th at 83 (internal quotation marks omitted).

Petitioner takes exception to the § 440.10 court's discrediting of Candice, highlighting that she previously "withstood a searching, comprehensive two-hour interrogation by the DA's office," during which she was "calm and more coherent" compared to her § 440.10 testimony. ECF No. 9 at 6 n.6, 31, 41. Yet that video

[23] In addition to the credibility considerations that the § 440.10 court identified, Candice testified that Clark knew Browning because they dated for some time and had two children together. SCR at 5394. I have seen no other evidence in the record that substantiates this statement, and Clark said that he was familiar with Browning because he sold her crack cocaine, *id.* at 2320–21. Candice's apparent misstatement of basic information about the people in her account further indicates that she was confused during her testimony.

interview is hardly a paragon of clarity. For example, Candice suggested in the interview that she, Kwan, and Clark boarded the ferry to Staten Island early in the morning and that the attempted robbery occurred sometime after it got dark outside, *see* SCR at 2326–27—but that leaves many hours wholly unaccounted for. While Candice's various learning disabilities might have interfered with her ability to present a narrative in an organized fashion, *see id.* at 2326–27, 5387–88, I find no clear error in the state court's determination that she was not a credible witness, nor does the video of Candice's interview persuade me otherwise.

**ii. David Clark, a.k.a. "Jamaican Tony"**

The § 440.10 court based its credibility determination as to Clark on the video and written statements that Dowd obtained in Jamaica; Clark did not submit to live testimony that would have provided an opportunity for cross-examination and closer observation of his demeanor. I review, then, the very same evidence that the § 440.10 court had at its disposal—and I find no clear and convincing evidence of an error by the motion court.

Petitioner suggests several reasons that the § 440.10 court's credibility finding was erroneous. They are each addressed in turn.

Petitioner writes that "the discrepancies that the motion court pointed to in discrediting [Clark's] statements all concern details that *any* witness might [] mistake[] [] 25 years after the fact." ECF No. 9 at 39–40. For some types of details,

perhaps discrepancies after a long period of time would be excusable. But the § 440.10 court also highlighted that trial testimony, including from petitioner's own alibi witness James Dale,[24] pointed to some involvement by Denise Concepcion in the events of July 4, 1992—and Concepcion is totally absent from Clark's account. SCR at 5596–97. This is not a "minor" discrepancy, *see* ECF No. 9 at 31; whether Concepcion or Browning (the victim and whom Clark stated he knew, SCR at 2320–21) served as the decoy who knocked on the apartment door is a fundamental detail. "[I]n light of the pre-existing evidence in the record," *Cosey*, 62 F.4th at 82, from both the prosecution and the defense, Clark's omission of Concepcion from his narrative is conspicuous and problematic. Moreover, that some details may be confused after twenty-five years does not explain the discrepancies between Clark's video and written statements, which were taken on the same night.

Petitioner also argues that the § 440.10 court erred by "ignor[ing] its own holding" admitting Clark's hearsay statements into evidence as a statement against penal interest. ECF No. 9 at 40. To qualify for this hearsay exception under New York law, a hearsay statement that "tends to expose the declarant to criminal liability and is offered to exculpate the defendant" is admissible only "when evidence

[24] The § 440.10 court's February 13, 2020, order mistakenly refers to defense witness James Dale as Cynthia Browning's brother. SCR at 5597. Rather, Dale is a friend of Larry Browning, one of Cynthia's brothers. *Id.* at 1346. The order's reference to Dale as having testified that he was involved in locating Concepcion after the shooting and bringing her to the police is otherwise accurate.

independent of the statement establishes a reasonable possibility that the statement might be true." N.Y. R. Ev. § 8.11(2)(c); *People v. Maerling*, 385 N.E.2d 1245, 1249–50 (N.Y. 1978).[25] Petitioner suggests that it was illogical for the § 440.10 court to find that the statements satisfied "a threshold showing of reliability" for admissibility purposes but were nonetheless unreliable evidence of actual innocence. ECF No. 9 at 40; *see also id.* at 31.

This argument conflates the admissibility of evidence with the weight given to that evidence. It is not contradictory, let alone erroneous, for a court to find a statement credible enough to admit into evidence but not credible enough to rely upon. *Cf. United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (distinguishing between authentication, which rendered evidence admissible, and the issue of 'ultimate reliability'); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) (acknowledging, in the context of expert testimony, instances of "shaky but admissible evidence"). The § 440.10 court explicitly recognized the distinction between admissibility and weight during its discussion on the admissibility of Clark's video statement. *See* SCR at 5475 (noting that counsel for

---

[25] The Federal Rules of Evidence establish a similar hearsay exception for a statement that "tends to expose the declarant to criminal liability." Fed. R. Ev. 804(b)(3). To be admissible as a statement against interest, the Federal Rules require, in part, that the statement be "supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it." *Id.*

the People "made some arguments" regarding the independent evidence offered to support Clark's video statement but nevertheless admitting the video into evidence because those arguments "go[] more to the weight than admissibility"). Thus, the state court did not err in subsequently determining that Clark was not credible.

Petitioner next maintains that the state court failed to appreciate certain corroborating evidence that helps establish the trustworthiness of Clark's statements.[26] First, petitioner stresses that the § 440.10 court never discredited the testimony of Dowd, the private investigator who took Clark's statements in Jamaica, so his testimony should have been considered corroboration of Clark's account. ECF No. 9 at 40. It is true that the § 440.10 court made no finding as to Dowd's credibility. But even if the § 440.10 court fully credited his testimony on the circumstances surrounding Clark's statements, Dowd's testimony did not, and could not, speak to the *content* of Clark's statements. Dowd professes no personal knowledge of the events of July 4, 1992, and his testimony could not bear on the reliability of Clark's statements.

Second, Petitioner contends that the Holman DD5—which the § 440.10 court did not consider—provides "contemporaneous" eyewitness testimony corroborating Clark's account by "identif[ying] Jamaican Tony not Foster Thompson as the

---

[26] Petitioner includes among this evidence Candice's statements and testimony, but because I find no error in the state court's finding that she was not credible, I will not consider her account as corroborating evidence here.

individual wearing a red sweatshirt [] present inside of the building at or near the time of the Browning murder." ECF No. 9 at 40. Because the connections between the DD5 and Clark are tenuous, however, the DD5 does little to corroborate Clark's statements.

Viewed liberally, the details that could link the Holman DD5 to Clark are as follows: (1) Holman identified a person she observed as "Tony," SCR at 2333, and, according to Brenda, Candice, and Clark, David Clark's nickname was Jamaican Tony, *id.* at 2320–21, 2323, 5392; (2) Holman reported that "Tony" sold crack, *id.* at 2333, and Clark admitted to selling crack during that time period, *id.* at 2320–21; (3) Holman reported that the second suspect that she observed (other than "Tony") was wearing a "DArk jamiaan [sic] hat," *id.* at 2333, and Clark speaks with a Jamaican accent, *id.* at 2299; and (4) Holman told the officer that "Tony" had a mustache, *id.* at 2333, and, during her 2016 interview with the District Attorney's Office, Candice gestured to indicate that Clark had a mustache, *id.* at 2326–27.

These connections are weak, and their force is further tempered by several counterpoints: Holman identified the person she saw as "Tony" but not *Jamaican* Tony. She told the police that "Tony" was five feet, seven inches in height, *id.* at 2333, but evidence in the record suggests Clark is much shorter.[27] The DD5 further

[27] Clark said in his video statement that Kwan, at five feet, nine or ten inches, was "much taller" than him. SCR at 2320–21. Petitioner's § 440.10 motion papers also asserted that "Jamaican Tony . . . is much smaller than [petitioner]," *id.* at 2292,

states that Holman told the police that "Tony" was wearing a red sweatshirt—the key identifying feature for a suspect in Browning's murder—but Clark never addressed what he was wearing that night.[28] Holman also reported that "Tony" had short hair and drove a blue Maxima, *id.* at 2333, but there does not appear to be evidence in the record as to whether those things were true of Clark at the time of the events. Most importantly, the DD5 cannot provide "contemporaneous" evidence to validate Clark's confession because Holman reported observations from about an hour before the shooting—and Clark mentioned nothing about being in the building for a significant period of time prior to approaching the apartment. Given these

---

and the § 440.10 court wrote that "any casual observation of [petitioner] shows that he can be considered, at the very least, average height," *id.* at 5599.

Other evidence in the record about Clark's height is mixed, however. The § 440.10 court wrote that Clark "stated in the video statement that he is five feet tall," *id.* at 5598, but Clark stated only "I'm five," and one could argue he trailed off in speaking rather than intending to state he was five feet tall. In addition, in her interview with the District Attorney's Office, Candice called Clark "short" and disparagingly referred to him as a "little midget"—but she also said Clark is maybe five feet, eight inches, explaining that she is five feet, one inch, and he is taller than she is. *Id.* at 2326–27. Finally, during one of petitioner's prior joint trials, defense counsel asked Concepcion if she was familiar with someone by the name of Jamaican Tony and described him as "about 5'6" tall." *Id.* at 4899–4900.

Even if Clark is indeed closer to five feet, seven inches like the "Tony" in the DD5, there is enough uncertainty here to find that the DD5 does not significantly corroborate Clark's account.

[28] Clark said only that he didn't have "proper clothing on" and "didn't want to get wet in the rain" when he left the building. SCR at 2320–21. He also said he hid his gun in a hat, *id.*, though he did not say if he had been wearing the hat—and in any event, Holman did not report that "Tony" had been wearing one.

weaknesses, I conclude that the DD5 does not meaningfully corroborate Clark's statements.[29]

Finally, setting aside petitioner's specific arguments and further assessing Clark's statements "on [their] own merits" and against the entire record, *Cosey*, 62 F.4th at 82, they lack indicia of reliability. For example, though Petitioner states Clark "has been extremely consistent about . . . details of the crime," ECF No. 9 at 39, that assertion presumes the validity of Brenda's testimony that Clark did in fact confess to her in 1992. Without Brenda's account—which was discredited by the state court—we are left only with Clark's written and video statements from the same night in 2017, rather than any consistent narrative across an extended period. *Cf. Jones v. Calloway*, 842 F.3d 454, 462 (7th Cir. 2016) (deferring to district court's crediting of new confession where alternate suspect had "immediately confessed" to police in 1999, "consistently maintained" that he acted alone, and provided testimony in 2014 habeas proceedings consistent with prior testimony in his own separately-tried criminal case). Dowd also testified that Clark viewed the video of Candice's interview with the District Attorney's Office before Clark provided his own statements, SCR at 5337–39, which could have influenced Clark's narrative. In

[29] Respondent argues that testimony at a prior joint trial of petitioner and Gilbert Franklin "leads inexorably to the conclusion" that the "Tony" to whom Holman was referring was instead Tony Brown, a.k.a. Tony Jiminez. ECF No. 11-1 at 13. Brown, however, described himself as wearing a shirt rather than a red sweatshirt that night, SCR at 5134, so respondent's theory is not without question.

addition, Clark's account was less consistent with the physical evidence. Clark said Cynthia Browning helped him gain entry to the apartment, but her body was found further inside the apartment rather than near the door. *Id.* at 5598. He suggested that the light in the kitchen was off, *id.* at 2320–21, but Staley testified it was on, and a responding officer also confirmed it was on when he arrived at the scene, *id.* at 414, 596–97. Clark's claim that he stashed his gun in the bushes and hid in a nearby building until the coast was clear necessarily means he was *not* one of the two individuals chased by the police—yet the police recovered guns tied to the crime scene in both of their wakes. *See id.* at 962–63, 985–86, 1024, 1066–67. Combined with the discrepancies already noted and the many omissions in his statements, Clark's confession is underwhelming.

For all of these reasons, I find that the § 440.10 court did not err in determining that Clark's statements were not trustworthy evidence that could be relied upon for the purposes of petitioner's actual innocence claim.

**iii. Holman DD5**

On the other hand, I find that the § 440.10 court's credibility determination as to the Holman DD5 illustrates clear and convincing error. The § 440.10 court did not consider the DD5 in its actual innocence analysis[30] and concluded, without

[30] The § 440.10 court did not consider the Holman DD5 in its actual innocence analysis because the DD5 was "neither reliable nor was it submitted as an exhibit in support of the instant hearing." SCR at 5589 n. 5. Although petitioner included the

explanation, that the DD5 was not reliable. SCR at 5589 n. 5. In the absence of any reasoning, I fail to see how the court found an eyewitness account documented by a police officer within a couple hours of the events to be unreliable. The Holman DD5 describes two suspects—"Tony" in a "[d]ark red sweat shirt" and another person in a "[b]lum [sic] jean shirt"—whose clothing each matched the clothing worn by one of the two suspects later pursued by the police. *Id.* at 2333. That Holman observed the precise combination of outfits worn by the two suspects lends credibility to her account. Further, the fact that she reported knowing "Tony" for "about one year" and provided other details about him (such as the make and color of his car), *id.*, makes it more likely that she correctly identified the person she saw. Finally, Holman's narrative of Browning calling out from her apartment window to Holman, who was outside in front of the building, is plausible in light of Staley, Concepcion, and Wolfe's testimony about Browning doing the same to Concepcion just a short while later. The DD5 thus offers credible evidence that someone identified as "Tony" was present close to the crime scene, about an hour before the crime

---

Holman DD5 as an exhibit in his original moving papers pursuant to CPL § 440.10, *id.* at 2332–33, the § 440.10 court is correct that petitioner did not introduce it during the actual innocence evidentiary hearing, *see generally id.* at 5317–5478 (evidentiary hearing transcript). In any event, the DD5 is still part of the "record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), and it can be considered on federal habeas review here.

occurred, wearing a red sweatshirt, with another person who was wearing a jean shirt.

* * *

In sum, I find that the § 440.10 court erred only in its finding that the Holman DD5 was unreliable.[31]

**b. Whether Petitioner's Claim Is Legally Compelling**

Having determined that part of petitioner's new exculpatory evidence—the Holman DD5—is credible, I turn now to the second step in the gateway analysis:

---

[31] Although petitioner relied only upon evidence from Candice and Clark, along with the Holman DD5, in support of his actual innocence claim, *see* ECF No. 9 at 41, most of his other evidence that could be considered newly presented would not be credible under the actual innocence gateway standard. *See Schlup*, 513 U.S. at 324. The § 440.10 court discredited Brenda Thompson's testimony at the evidentiary hearing, and there is no clear error in that credibility determination. In addition, Officer Garzone's affidavit has been discredited as inconsistent with prior testimony and the § 440.10 court found that the alleged evidence regarding the missing red sweatshirt was rooted in conjecture. Petitioner's suggestion that he was charged in the Browning case in an attempt to get him to admit to an unrelated string of bank robberies—which he does not bring up in his habeas petition—similarly involves considerable speculation. In contrast, the § 440.10 court did not note any credibility concerns regarding the material witness order for Concepcion. Nevertheless, the material witness order would not help provide legally compelling evidence of Thompson's actual innocence, because Concepcion's testimony was already hotly contested.

assessing whether petitioner has made a legally compelling showing of actual innocence.

An actual innocence claim is "compelling" if the petitioner demonstrates that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). New evidence need not demonstrate factual innocence "to an absolute certainty." *Hyman v. Brown*, 927 F.3d 639, 657 (2d Cir. 2019) (internal quotation marks omitted). But it must be "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. When reviewing a gateway claim of actual innocence, I "must consider all [record] evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 537–38 (internal quotation marks omitted). Further, I "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332.

The Second Circuit has observed that compelling actual innocence claims have shared a common element: new evidence "directly supported petitioner's factual innocence by indicating either that he *did not* commit, or *could not* have committed, the crimes of conviction." *Hyman*, 927 F.3d at 665; *see also Jimenez*,

96 F.4th at 186. Discussing three such claims—all "close cases"—the court noted that "compelling evidence of innocence came through a *combination* of eyewitness misidentification, testimony and forensic evidence ruling out the petitioner's ability to commit the crime, and evidence strongly incriminating a third party." *Jimenez*, 96 F.4th at 184–86 (summarizing the court's analysis in *Hyman*) (emphasis added).

Petitioner's credible new evidence does not fit this mold. The Holman DD5 may help indicate that petitioner did not commit the crimes of conviction by introducing an alternate suspect who was wearing a red hooded sweatshirt, but the DD5 is just one piece of evidence, and it only *suggests* eyewitness misidentification. It also does not "strongly" incriminate any particular third party.

The Second Circuit has also explained, however, that in some circumstances the standard for evidence to be legally compelling may differ. Where "the remaining inculpatory evidence is weak, [] 'it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict' in order to pass through the innocence gateway." *Id.* at 186–87 (quoting *Rivas*, 678 F.3d at 543). In *Jimenez*, the Second Circuit reflected on the strength or weakness of the remaining inculpatory evidence in previous cases involving actual innocence gateway claims. The Second Circuit characterized the remaining inculpatory evidence as weak in *House v. Bell*, 547 U.S. 518 (2006), and *Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012), which were cases where such evidence

was entirely or almost entirely circumstantial. *See Jimenez*, 96 F.4th at 185–87; *see also House*, 547 U.S. at 540; *Rivas*, 687 F3d at 522. The Second Circuit also found the remaining inculpatory evidence to be weak in *Jimenez* itself, where that evidence comprised "only the uncorroborated accusation of a single eyewitness, whose reliability had been vigorously contested through cross-examination at trial" and whose description of the shooter's appearance was at odds with the petitioner's appearance at the time of the crime. *Id.* at 186. In contrast, it explained that the remaining inculpatory evidence was *not* weak in a case like *Hyman v. Brown*, 927 F.3d 639 (2d. Cir. 2019), where the only eyewitness who identified the petitioner recanted but there were still three other eyewitnesses, ballistics evidence, and a concession from the petitioner that he had been on the scene. *Jimenez*, 96 F.4th at 186.

An assessment of the incriminating evidence offered in petitioner's case is as follows:

*Alton Staley.* Staley provided an eyewitness identification of petitioner, who was someone known to him. Staley was seriously injured in the shooting, and no evidence has been offered suggesting he had a motive to falsely accuse petitioner. Nevertheless, Staley had incentive to offer up *any* suspect in the murder to protect his own interests: He was arrested at the scene on suspicion of attempted murder, assault, and drug possession and was ultimately charged with drug and weapon

possession offenses—but he received transactional immunity for the content of his grand jury testimony. Considering the forensic pathologist's trial testimony that he could not confirm the caliber bullet or bullets that hit Browning, along with Staley's own admission that he exchanged gunfire with the intruders, SCR at 387–92, 395, 1167–68, Staley's grand jury testimony that identified petitioner not only did away with Staley's existing drug and weapon possession charges but also shielded him from additional criminal charges related to any potential role his gunfire may have had in Browning's death.

In addition, there is some—albeit limited—basis to question Staley's identification of petitioner given his repeated misstatement of petitioner's last name as "Thomas," *see, e.g.*, *id.* at 398–99, 448, as well as questions around whether, or to what extent, Staley and petitioner actually overlapped during their school days, *see id.* at 2295. As petitioner highlighted in his § 440.10 motion papers, Staley also testified at co-defendant Franklin's later trial that the person who knocked on the door to the apartment and asked for Browning used a Jamaican accent, but petitioner does not have a Jamaican accent. *See id.* at 2297–99.

Finally, certain elements of Staley's testimony are somewhat dubious. Staley testified that his own .25-caliber pistol jammed, but petitioner nevertheless took it, unjammed it, and used it to shoot Staley. *Id.* at 396, 437–39. This detail comes across as improbable in the chaos of the events, particularly since Staley stated that

petitioner was already armed with a gun. *Id.* at 436. Moreover, because the .25-caliber pistol was found in the denim jacket rather than along the path taken by the individual in the red sweatshirt, Staley's account also necessitates the logical inference that, while fleeing the scene, petitioner found a moment to hand off Staley's pistol to the other perpetrator.

*Denise Concepcion.* Concepcion's identification of petitioner provided the sole account of petitioner wearing a red sweatshirt, supporting the prosecution's theory that petitioner was the individual in the red sweatshirt later pursued by the police. But Concepcion's identification is highly questionable—it was months after the fact, based on her purported observation of the suspect's eyes alone, and relayed in a room where petitioner's "wanted for murder of Cynthia Browning" poster was visible. *Id.* at 737, 845; ECF No. 31-1 at 41–42. Her trial testimony was prompted by a material witness order, and her waffling testimony on whether the suspect in the red sweatshirt had a "rat face" introduces doubt separate and apart from the fact she did not see his entire face.

Three other witnesses (Staley, Wolfe, and Dale) corroborated Concepcion's presence near the scene of the crime. Yet Concepcion's identification of petitioner as one of the perpetrators of the shooting stands on shaky ground.

Notably, Concepcion is now deceased; she died sometime before petitioner filed his § 440.10 motion in 2018. *See* ECF No. 9 at 54.

*Dawne Wolfe.* While Wolfe was a witness for the prosecution, her trial testimony ultimately cannot be considered inculpatory. She described petitioner as wearing a navy sweatshirt with no hood—not a red hooded sweatshirt. And she said she saw him running from the back of the building next door to the crime scene—131 Jersey Street—but then standing in front of that building, which is inconsistent with a police chase and instead aligns with petitioner's alibi testimony.

*Responding Officers.* Responding officers testified that they pursued a suspect wearing a red sweatshirt (as well as one wearing a denim jacket), and that they found a 9-millimeter pistol that they believed that suspect discarded while he fled. It is not known who gave the police the description of the suspects' clothing before the police initiated their pursuit. *See* SCR at 1607 (defense summation stating "[n]o one can identify who called the cops to say what had happened"). In any event, the police testimony does not stand on its own as incriminating evidence. Linking petitioner to the red-sweatshirted suspect that the police chased and the gun they found (which ballistics confirmed was used at the crime scene) requires crediting an identification from Staley or Concepcion.[32]

Taken together, the inculpatory evidence boils down to (1) one eyewitness who was acquainted with petitioner but also had reason to offer up a suspect to

---

[32] Staley and Concepcion each identified petitioner. And Staley and Concepcion both testified that the black 9-millimeter pistol the police recovered was the weapon they saw petitioner holding. SCR at 425–26, 737–39.

protect himself, (2) one now-deceased eyewitness whose identification of petitioner was months after the shooting and based only on her observation of the suspect's eyes, and (3) testimony, including from petitioner's alibi witnesses, placing petitioner near the building where the crime took place at the time the crime was occurring.

With no physical evidence and, effectively, just one contested eyewitness identification, the prosecution's case here resembles the inculpatory evidence that the Second Circuit deemed weak in *Jimenez*. *See* 96 F.4th at 186. The case is slightly stronger here given that petitioner was known to Staley, and there *is* evidence "linking [petitioner] to the time [and] place of the crime." *See id.* (distinguishing *Hyman v. Brown*, 927 F.3d 639 (2d Cir. 2019)). Nevertheless, because the motives underlying Staley's testimony are questionable, and the alibi testimony only places petitioner in the area of the crime rather than at the scene, I find the inculpatory evidence is appropriately characterized as weak.

Against weak incriminating evidence, petitioner therefore need not present any particular type or combination of credible new evidence to advance his actual innocence gateway claim. *See Jimenez*, 96 F.4th at 186–87. But his credible new evidence still must "thoroughly undermine[]" the evidence underpinning his conviction, *id.* at 186 (quoting *Rivas*, 687 F.3d at 543), and the Holman DD5 cannot satisfy this tall order.

The Second Circuit's analysis in *Rivas* is instructive. As noted above, the incriminating evidence in that case was "almost entirely circumstantial," *Rivas*, 687 F.3d at 522, and was overall "weak," *Jimenez*, 96 F.4th at 186. Considering whether the petitioner had satisfied the actual innocence gateway, the court in *Rivas* first evaluated new exculpatory material in the form of a police report and other previously undisclosed information indicating that the murder victim (1) "was involved in an intimate relationship with a man other than [the petitioner] around the time of her murder," (2) " had lodged a complaint against a coworker not long before her death," and (3) had a neighbor with a prior burglary arrest who "was known to peer through windows." *Rivas*, 687 F.3d at 545–46. The Second Circuit concluded that this evidence "might suggest that the police failed to pursue other leads in the investigation, but does not compellingly point to [the petitioner's] innocence." *Id.* at 546. It elaborated that "[this] evidence, taken together, raises doubts about [the petitioner's] guilt, but it does not, in isolation, so undermine the State's circumstantial evidence as to satisfy the *Schlup* standard [for actual innocence]." *Id.*[33]

[33] It was only through other new evidence—"a new expert opinion that revised the victim's time of death to a period when [the petitioner] had an unchallenged alibi, as well as [] unchallenged testimony discrediting the originally incriminating medical examiner's report"—that the *Rivas* court found legally compelling evidence of actual innocence. *Jimenez*, 96 F.4th at 186. And even that was a "close case." *Rivas*, 687 F.3d at 546.

Here, petitioner's credible new evidence similarly "suggest[s] that the police failed to pursue other leads in the investigation" by failing to scrutinize a potential suspect recognized as "Tony," who was described with some identifying details in the Holman DD5. Like the evidence that was inadequate in *Rivas*, though, the DD5 merely "raises doubts" about petitioner's guilt; it does not "compellingly point to [his] innocence." The reliability of Staley and Concepion's identifications was contested at trial, and the DD5 could support the idea that Concepcion's identification of petitioner as the man in red sweatshirt was mistaken. But the DD5 does not dilute Staley's identification that was based on his prior familiarity with petitioner. *See Jimenez*, 96 F.4th at 186–87 (recantation of an eyewitness and new alibi testimony did not undermine "the independent basis for [another eyewitness's] identification"). It also does not negate other evidence that petitioner was in the area of the crime scene as the crime was unfolding. The DD5 thus does not "*thoroughly* undermine[] the evidence supporting the jury's verdict." *See Rivas*, 687 F.3d at 543 (emphasis added).

While the motion to amend the petition of habeas corpus is denied, *see infra*, I note that the documents with which petitioner sought to amend his petition would not alter my conclusion that he has not presented legally compelling evidence of actual innocence. Petitioner moved to amend his petition to incorporate evidence from the investigation into the murder of Finley Graves that was recently disclosed

pursuant to petitioner's FOIL requests and related litigation. ECF No. 42 at 1–2. Graves was killed under similar circumstances to Cynthia Browning, on the same floor of the same building, about one year before Browning's death, and Graves's murder case was never solved. *See id.* at 2–3. The new documents reveal that Browning herself was an eyewitness in the Graves murder investigation and that she identified two suspects—neither of whom was petitioner—to the police. *Id.* Petitioner argues that the Graves documents are exculpatory because they provide evidence of people other than petitioner who used a similar *modus operandi* in the Graves murder and who may have been motivated to harm Browning. *Id.* at 3. He claims this evidence is significant because "the motive for Browning's murder was never adequately explained, a point contested by the defense at trial." *Id.*

Presuming for the sake of argument that the documents from the Graves murder investigation are credible new evidence for purposes of the gateway analysis, these documents would introduce another potential lead that the police ostensibly did not investigate. They do not, however, affirmatively tie any other person to the crimes at issue here, and they do not undercut Staley's identification of petitioner. Together, the DD5 and the Graves documents would certainly raise doubts, but they are not enough to allow petitioner to pass through the actual innocence gateway.

Despite petitioner's new, credible evidence—and despite the very real and troubling weaknesses in the prosecution's case—a reasonable juror could

nonetheless find petitioner guilty beyond a reasonable doubt. A reasonable juror could still credit Staley's identification of petitioner. A reasonable juror could still discount petitioner's alibi witnesses, whose testimony places petitioner near the scene of the crime. And a reasonable juror could acknowledge the leads the police may not have pursued but nevertheless determine that those unexamined leads are not incompatible with petitioner's guilt. Petitioner therefore has not shown that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538.

I make this finding reluctantly, because the facts of this case leave many questions unresolved and some of the circumstances around the investigation and prosecution are enough to raise eyebrows. Nevertheless, petitioner's credible new evidence is weak, and I am bound by the 'deliberately demanding' standard of the actual innocence gateway. I thus cannot consider petitioner's untimely *Brady* and ineffective assistance of counsel claims.

## II. Timely Due Process Claim

Petitioner argues that the § 440.10 court denied him due process by prohibiting him from subpoenaing Macron and Staley to testify at the evidentiary hearing. ECF No. 9 at 47. This claim arose during petitioner's state collateral post-conviction challenge, and respondent argues that a procedural defect in a state

collateral proceeding is not cognizable on federal habeas review. ECF No. 11-1 at 17–18.

Habeas corpus review under 28 U.S.C. § 2254 is permitted only where a petitioner alleges that they are in state custody in violation of "the Constitution or a federal law or treaty." *See* 28 U.S.C. § 2254(a). Neither the Constitution nor federal law compels states to provide an avenue for collateral post-conviction review. *Word v. Lord*, 648 F.3d 129, 131–32 (2d Cir. 2011) (per curiam). As such, the Second Circuit held in *Word v. Lord* that "alleged errors in a post-conviction proceeding are not grounds for § 2254 review." *Id.* at 132; *see also id.* at 131 (collecting decisions from other circuits reaching similar conclusions). District courts in this circuit have accordingly found that an alleged due process violation in a § 440.10 proceeding—as petitioner puts forward here—is not cognizable on federal habeas review. *See, e.g.*, *Taylor v. Kaplan*, No. 14-cv-1402 (ERK) (LB), 2017 U.S. Dist. LEXIS 39206, at *11–12 (E.D.N.Y. Mar. 17, 2017); *Khan v. Capra*, No. 19-CV-533 (KAM), 2020 U.S. Dist. LEXIS 210000, at *24–25 (E.D.N.Y. Nov. 10, 2020); *Hall v. Lee*, No. 15 Civ. 2559 (LGS)(KNF), 2016 U.S. Dist. LEXIS 119013, at *15 (S.D.N.Y. Sept. 1, 2016).

Petitioner contends that the Supreme Court's decisions in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Ayestas v. Davis*, 584 U.S. 28 (2018), nevertheless render his

due process claim viable. *See* ECF No. 15 at 21–23. His reliance on each of these cases is misplaced.

In *Martinez*, and later in *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court held that a prisoner seeking federal habeas relief could overcome the procedural default of an ineffective assistance of trial counsel claim under certain circumstances when the framework of state procedural law "makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 569 U.S. at 429.

Based on *Martinez*, petitioner argues that because New York state law prevented him from raising his actual innocence claim until the collateral § 440.10 proceedings, an alleged due process violation during those proceedings would implicate his federal constitutional rights and should be reviewable on habeas. *See* ECF No. 15 at 21–23. This argument rests, however, on the faulty premise that the procedural default at issue in *Martinez* is analogous to the non-cognizability at issue here. The doctrine of procedural default is a matter of comity and finality, and federal courts retain authority to consider the merits of procedurally defaulted claims. *See Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir. 2000), *overruled in part on other grounds by Dretke v. Haley*, 541 U.S. 386 (2004). In contrast, cognizability is a matter of jurisdiction. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008) ("The two linguistic forms

(‘cognizable by’; ‘has jurisdiction’) mean about the same thing.”). Because there are no “equitable exceptions” to jurisdictional requirements, *see Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023), the rationale underlying the *Martinez* exception to procedural default has no relevance here.

*Ayestas* likewise fails to support the cognizability of petitioner’s due process claim. In that case, a habeas petitioner argued he fell within the *Martinez* exception to allow for consideration of his otherwise-defaulted ineffective assistance of counsel claim on habeas review. *See Ayestas*, 584 U.S. at 34–35. At issue was whether he was entitled to investigative funding, as provided by 18 U.S.C. § 3599 for petitioners facing the death penalty, to help him further develop his claim to establish that he in fact met the conditions to avoid procedural default (and to prove the claim on the merits). *Id.* at 35. The Court held that the lower courts applied the wrong legal standard to assess whether the petitioner was entitled to funding. *Id.* at 31.

Petitioner takes the *Ayestas* Court’s very consideration of the investigative funding question to demonstrate that “issues that impact [a] petitioner’s ability to present a claim in [a post-conviction] proceeding”—in *Ayestas*, “rulings that impede the ability to investigate,” and here, a ruling on the “ability to interview and call witnesses”—are “cognizable on habeas.” *See* ECF No. 15 at 22–23. Setting aside that the specific context of *Ayestas* was, unlike here, a capital habeas case, *see* 584

U.S. at 31; 18 U.S.C. § 3599, petitioner glosses over the non-analogous posture of that case. The Court in *Ayestas* was reviewing the lower courts' ruling on a habeas petitioner's *ex parte* motion that was made during an ongoing habeas proceeding. The Court was not, as petitioner urges this court to do here, evaluating a *claim* on habeas review based on a ruling by a *state* court in a *collateral post-conviction proceeding*. *Ayestas* is wholly inapposite.

*Martinez* and *Ayestas* do not disturb the holding of *Word*, with which all but one circuit court agree, *see Green v. Rodriguez*, No. 19-cv-1051 (CSH), 2019 U.S. Dist. LEXIS 172247, at *3 n.3 (D. Conn. Oct. 3, 2019), and which district courts in this circuit continue to follow. Petitioner's due process claim is not cognizable.

**III. Motion to Produce Voucher**

To bolster his *Brady* claim as to the missing red sweatshirt, petitioner also moves for an order to compel the District Attorney to produce its "police property clerk invoice for the red sweatshirt that police allegedly recovered in co-defendant Gilbert Franklin's [unrelated] case" or to "confirm that the voucher does not exist." ECF No. 35 at 1. He therefore requests discovery.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Instead, courts have discretion to permit discovery upon a petitioner's showing of good cause, "where specific allegations before the court

show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Id.* at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)) (internal quotation marks omitted); *see also Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003).

Here, petitioner cannot demonstrate that he may be entitled to relief from his conviction if he is permitted discovery regarding the red sweatshirt voucher in Franklin's unrelated case because the underlying *Brady* claim is untimely and he has not adequately shown his actual innocence to overcome this procedural bar.[34] Thus, no further discovery is warranted and his motion is denied.

## IV. Motion to Amend Petition

Petitioner finally moves to amend his petition to incorporate documents that were recently disclosed pursuant to petitioner's FOIL requests and related litigation. *See* ECF No. 42 at 1–2.

Leave to amend a habeas petition should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Littlejohn v. Artuz*, 271 F.3d 360, 362 (2d Cir. 2001). Nevertheless, in circumstances where amendment would be "futile,"

[34] On the merits, even if the District Attorney were to confirm—as petitioner theorizes—that no voucher exists, this detail would only incrementally add to his circumstantial evidence that the red sweatshirt was removed from the evidence in his case. *See supra* n. 19. Petitioner still would not be able to establish that the sweatshirt was in fact suppressed and was favorable, and therefore he still could not make out a *Brady* claim.

leave is properly denied. *See, e.g.*, *Kaminski v. Semple*, 796 F. App'x 36, 40 (2d. Cir. 2019). Because AEDPA generally requires a state prisoner to exhaust all challenges to their conviction in state court before seeking federal habeas review, *see* 28 U.S.C. § 2254(c), a district court faced with a so-called "mixed" petition for habeas corpus containing exhausted and unexhausted claims typically must dismiss any unexhausted claims or dismiss the petition in full, *Rose v. Lundy*, 455 U.S. 509, 510 (1982). Amending a habeas petition to add an unexhausted claim is therefore usually considered futile.

That is precisely what petitioner seeks to do here. To review, the original petition asserted *Brady* violations as to the Holman DD5 and the red sweatshirt. Petitioner's intended amendment would incorporate documents regarding a different murder that took place a year before Browning was killed, for which she was a key eyewitness, and petitioner claims the documents constitute withheld evidence of alternate suspects who had a motive to harm Browning. *See* ECF No. 42 at 1–3. He argues the newly obtained information "does not assert new legal claims" but rather "materially strengthens" his "pending [] claim" that prosecutors violated his constitutional rights under *Brady* by withholding materially exculpatory evidence. *Id.* at 1, 4.

Petitioner's attempts to frame his *Brady* allegations—old and new—as one broad claim are unconvincing. *See, e.g.*, *Landano v. Rafferty*, 897 F.2d 661, 669 (3d

Cir. 1990) ("[A] general claim that the prosecutor has suppressed exculpatory information cannot satisfy the exhaustion requirement as to all subsequent Brady claims that a habeas petitioner may bring."). To satisfy AEDPA's exhaustion requirement, a petitioner "must apprise the highest state court of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition," *Galdamez v. Keane*, 394 F.3d 68, 73 (2d Cir. 2005), but here the state court was never presented with the Graves investigation documents. While the documents could, like the Holman DD5, help point to alternative suspects or unexplored leads, the documents constitute a new factual basis for a *Brady* claim that is distinct from the alleged *Brady* violations he has previously raised in his petition. *See Gonzalez v. Travis*, 172 F. Supp. 2d 448, 454 (S.D.N.Y. 2000) (explaining that claims are unexhausted "where the factual underpinnings of the habeas petition are substantially different from those presented to the state court"); *see also Vasquez v. Hillery*, 474 U.S. 254, 260 (1986) (introducing new factual allegations that "fundamentally alter the legal claim already considered by the state courts" would improperly circumvent a petitioner's exhaustion obligations). Petitioner's intended amendment would therefore introduce a separate, unexhausted *Brady* claim.

Amending a habeas petition to add an unexhausted claim would not, however, be futile if a district court may stay the federal habeas proceedings and hold them in abeyance. *Morris v. Bennett*, No. 23-CV-3762 (RPK), 2023 U.S. Dist. LEXIS

216303, at *5 (E.D.N.Y. Dec. 5, 2023). A stay and abeyance pauses the proceedings in federal court, allowing a petitioner "to present his unexhausted claims to the state court in the first instance, and then to return to the federal court for review of his perfected petition." *Rhines v. Weber*, 544 U.S. 269, 271–72 (2005). Thus, if the federal court is prepared to grant a stay and abeyance, a petitioner "amending [their] petition to add unexhausted claims would not inherently lead to the claim's dismissal." *Morris*, 2023 U.S. Dist. LEXIS 216303, at *5.

A stay and abeyance is proper "only in limited circumstances." *See Rhines*, 544 U.S. at 277–78.[35] This is not one of them. It would make little sense to employ a procedure designed to preserve the timeliness of exhausted claims in a case where the exhausted claims are largely *un*timely and otherwise non-cognizable. Because a stay and abeyance would be inappropriate, leave to amend the petition with an unexhausted claim would be futile and is denied.

---

[35] The Supreme Court has held that a stay and abeyance may be granted only where the "petitioner ha[s] good cause for his failure to exhaust," the unexhausted claims are not "plainly meritless," and the petitioner has not "engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 277–78. Courts have declined to grant a stay and abeyance not only where the *Rhines* factors are not satisfied but also where a stay and abeyance would not serve the purposes of the procedure. *See, e.g.*, *Dang v. Sisto*, 391 Fed. Appx. 634, 635 n.9 (9th Cir. 2010) (no need to consider petitioner's request for a stay where the underlying habeas petition was untimely, as "[a] stay would have availed him nothing").

## V. Certificate of Appealability

The final matter to be resolved is whether the Court should issue a certificate of appealability ("COA").

A COA may be issued only "if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). On their face, neither a freestanding actual innocence claim nor a due process claim predicated on alleged errors in a post-conviction proceeding can satisfy this standard, so a COA will not issue on these bases.

Petitioner's *Brady* and ineffective assistance of counsel claims were rejected as time-barred. For claims denied on procedural grounds, the Supreme Court has set forth the following inquiry:

> [A] COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Supreme Court has further explained that "[o]btaining a [COA] 'does not require a showing that the appeal will succeed,' and '[courts] should not decline the application . . . merely because [they] believe[] the applicant will not demonstrate an entitlement to relief.'" *Welch v. United States*, 578 U.S. 120, 127 (2016) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003)). In fact, a COA may issue even if "every jurist of reason might

agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338.

I address the procedural ruling first. Although this order's statutory timeliness and equitable tolling determinations are not debatable, the actual innocence gateway standard "is sufficiently malleable to generate debate among reasonable jurists" and "not capable of reduction to hard-and-fast rules that would preclude discussion." *Cf. Wright v. Po*, No. 10-CV-5127 (MKB), 2021 U.S. Dist. LEXIS 124457, at *54–55 (E.D.N.Y. July 2, 2021) (granting COA for sufficiency of the evidence claim "as the totality of the circumstances analysis requires judges to review all of the evidence and make a commonsense judgment about what reasonable juries could or could not do").

I next address whether petitioner states a valid claim of the denial of a constitutional right. Reasonable jurists could not debate whether petitioner states a viable *Brady* claim regarding the missing red sweatshirt. *See supra* n. 19. I also find that reasonable jurists could not debate whether petitioner states a valid ineffective assistance of counsel claim based on the failure to call Brenda and Candice as witnesses. Trial counsels' decisions regarding which witnesses to call are inherently strategic decisions that generally should not be disturbed. *See Pavel v. Hollins*, 261 F.3d 210, 217 (2d Cir. 2001). It was reasonable for trial counsel to avoid calling family members with inconsistent accounts and to instead seek to undermine the

prosecution's evidence, especially given petitioner's near-acquittal in a prior trial—by a vote of ten to two—using this strategy. Moreover, petitioner's claim that trial counsel's failure to call Candice was unreasonable because it was based on "his false belief that minors are not competent witnesses," ECF No. 15 at 27, rests on Brenda and Candice's testimony during the evidentiary hearing on petitioner's § 440.10 application, which has been discredited by the motion court.[36]

In contrast, petitioner's *Brady* claim based on the Holman DD5—which argues that the DD5 was withheld and was favorable evidence that could have been used to suggest an alternative suspect and challenge the thoroughness of the police investigation—is "at least debatable, which is all that is required for a certificate of appealability to issue." *Hunter v. Annucci*, No. 19-CV-1321 (MKB), 2023 U.S. Dist. LEXIS 75563, at *68 (E.D.N.Y. May 1, 2023).

I thus grant a COA on the issue of whether petitioner satisfies the actual innocence gateway standard to excuse the untimeliness of his DD5 *Brady* claim. If an appellate court were to find that petitioner does satisfy the actual innocence gateway standard, then the COA should also allow for further consideration of the motion to amend, which was otherwise rejected based on the untimeliness or non-cognizability of his original claims. I decline to issue a COA on petitioner's

[36] Respondent also argues that the ineffective assistance of counsel claim is unexhausted. ECF No. 11-1 at 18. Because the claim is otherwise meritless, it is unnecessary to address the issue here.

remaining claims or on his motion to compel production of the police voucher for the red sweatshirt in co-defendant Franklin's unrelated case, which is tied to petitioner's meritless *Brady* claim for the missing red sweatshirt.

## CONCLUSION

The petition for a writ of habeas corpus, the motion to compel production of a police property clerk invoice, and the motion to amend the petition are denied. A COA is granted limited to the issue noted above.

**SO ORDERED.**

Brooklyn, New York
August 20, 2026

/s/ Edward R. Korman
Edward R. Korman
United States District Judge